**Roberto TEFEL, et al., on behalf of themselves and all others similarly situated, Plaintiff/Petitioners,**

v.

**Janet RENO, Attorney General of the United States; Robert Wallis, District Director; Immigration and Naturalization Service and Department of Justice, Board of Immigration Appeals, Defendant/Respondents.**

No. 97–0805–CIV.

United States District Court, S.D. Florida.

June 24, 1997.

---

Ira J. Kurzban, Kurzban, Kurzban, Weinger & Tetzeli, P.A., Miami, FL, Elliot H. Scherker, Oscar Levin, Greenberg, Traurig, Hoffman, Rosen & Quentel, P.A., Ester Olavarria Cruz, Vincente Tome, Rebecca Sharpless, Florida Immigration Advocacy Center, Miami, FL, Mario Martin Lovo, Mario M. Lovo, P.A., Miami, FL, Mary E. Kramer, Law Offices of Mary E. Kramer, Miami, FL, Linda Kelly, St. Thomas Law School, Miami, FL, Mario Louis, Miami, FL, Ernesto Varas, Law Office of Ernesto Varas, Miami, FL, Kari Woodward Carranza, Jeannette Mirabal, Law Offices of Magda Montiel Davis, Miami, FL, Robert L. Boyer, Law Offices of Robert L. Boyer, Miami, FL, for Plaintiffs.

Dexter A. Lee, Asst. U.S. Atty., Miami, FL, David Bernal, Senior Litigation Counsel, Office of Immigration Litigation, Dept. of Justice, Washington, DC, F. Franklin Amanat, Nelda C. Reyna, Trial Attorney, Office of Immigration Litigation, Dept. of Justice, Washington, DC, Ernesto Molina, Trial Attorney, Office of Immigration Litigation, Dept. of Justice, Washington, DC, Laura M. Friedman, Trial Attorney, Office of Immigration Litigation, Dept. of Justice, Washington, DC, for Defendants.

## *PRELIMINARY INJUNCTION*

JAMES LAWRENCE KING, District Judge.

### *Prologue*

With the drums of war beating an ever increasing cadence of death, destruction and misery across Central America during the 1980s, refugees, in the tens of thousands, fled their homelands. They came with the hope that a nation renowned throughout the civilized world for justice, fairness and respect for human rights would help them in their time of need.

These people, a trickle at first, then a torrent, and finally a flood, crossed illegally into the southwestern United States.

Many of these people, within a few days, weeks or months, reported to immigration

authorities, explained their plight, and sought help in obtaining government-issued work permits to enable them to find employment to support themselves and their families.

Throughout the administrations of three United States presidents, the Immigration and Naturalization Service carried out the policies of those administrations and responded in a humane and compassionate manner by issuing the necessary documentation, granting work permits, and helping them integrate into our society. Along with the work permits, issued year after year by the Defendants, was a document described as an "Order to Show Cause," advising the individual refugees that although they were being permitted to remain in this country, they were subject to deportation.

While the bloody civil conflicts continued in Nicaragua and El Salvador, tens of thousands of these refugees commenced new lives in America.

With the blessing of successive administrations and the Defendant Immigration and Naturalization Service, they found employment, established homes, married, had children and grandchildren, started businesses, paid taxes, obeyed our laws and contributed to their community, state and new country.

Although they did not know, these persons, who had lived here for many years, were about to be uprooted from their homes, separated from their families and deported.

### *Procedural Background* [1]

On March 28, 1997, a Verified Class Action Complaint for Declaratory, Injunctive and Mandatory Relief and Writ of Habeas Corpus was filed with this Court by forty-one (41) Plaintiffs on behalf of themselves and a class representing thousands of persons similarly situated.

The class of persons in this case consists of:

All individuals within the states of Georgia, Alabama and Florida who have been or will be denied suspension of deportation as a result of the BIA's decision to apply the transitional rule of § 309(c)(5) of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) retroactively to persons who have sought or are seeking suspension of deportation.[2]

The action was also brought on behalf of a subclass of persons, "who are Nicaraguan nationals who paid substantial fees to reopen their cases and/or to seek suspension of deportation as a result of the defendants' inducements and promises that their applications for suspension would be considered when in fact the defendants now refuse to consider such applications." [3] This subclass alone numbers in the tens of thousands.[4]

This lawsuit seeks to challenge the Defendants' [5] policy that deprives them of their right to seek suspension of deportation in the United States. The Defendants' policy, as expressed in the decision of Defendant Board of Immigration Appeals in *Matter of N–J–B*, Interim Decision No. 3309, 1997 WL 107593 (BIA 1997), is to strip the Plaintiffs and class members of their right to seek suspension of deportation by applying § 309(c)(5) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, enacted as Division C of the Departments of Commerce, Justice and State, and the Judiciary Appropriations Act of 1997, Pub.L. No. 104–208, 110 Stat. 3009 ("IIRIRA"), retroactively to bar such claims.

The Plaintiffs challenge the Government's conduct in four counts. Count I of the Com-

---

1. The parties have each submitted excellent memoranda concerning their respective positions. The factual recital of the procedural background, as set forth in the brief of the Plaintiff class, has been adopted, in part, into this opinion as a concise statement of the intensive litigation occurring in this case over the past thirty days. In adopting this recital, the Court has carefully eliminated from Plaintiffs' summary any fact believed to be in dispute. This is done solely in the interest of enabling the Court to comply with its announcement at the conclusion of the hearing on June 12, 1997, that the Court would render this Opinion as quickly as possible.

2. Complaint at ¶ 55.

3. *Id.*

4. Plaintiffs' Ex. 12, indicating that approximately 31,000 Nicaraguans have been in the United States for 7 years or more who are in INS docket control. An additional 22,000 Nicaraguans have submitted applications for asylum, 80% of whom are long-term applicants eligible for suspension of deportation. Plaintiffs' Exs. 12 and 13.

5. Janet Reno, Attorney General of the United States; Robert Wallis, District Director; Immigration and Naturalization Service; Department of Justice; and the Board of Immigration Appeals.

plaint challenged the Defendants' interpretation of § 309(c)(5) of IIRIRA as being arbitrary and capricious in violation of both the Immigration and Nationality Act and the Administrative Procedures Act. Count II challenged the Government's conduct as violative of the Immigration and Nationality Act and the Due Process Clause and Equal Protection guarantees of the Due Process Clause of the Fifth Amendment. The due process claims relate to the Government's conduct in creating, and thus denying, Plaintiffs' liberty and property interest in applying for suspension of deportation. Plaintiffs raise an equal protection claim based upon Defendants' dissimilar treatment of persons similarly situated in regard to suspension of deportation. Count III of Plaintiffs' Complaint sought estoppel against the Government by virtue of its conduct with regard to the subclass of Nicaraguan nationals seeking suspension of deportation. This count sought to challenge the conduct of the Defendants in inducing Nicaraguans to come forward and pay substantial fees to the Immigration and Naturalization Service on the promise that they would have a hearing on their claims for suspension of deportation. The Plaintiffs contend that the Defendants invited and encouraged tens of thousands of Nicaraguans to apply for suspension of deportation and to pay fees, knowing Congress was considering eliminating the right of Nicaraguans to seek suspension of deportation in the United States. Count IV of the Complaint addressed the alleged denial of due process in *Matter of N–J–B* itself, because the Defendant Board of Immigration Appeals ("BIA") had *ex parte* communication with the Defendant Immigration and Naturalization Service, invited them to submit a brief on the issue that the case was ultimately decided upon, and never contacted or gave N–J–B–'s counsel the opportunity to brief the issue that formed the basis for the Defendant BIA's decision.

On April 17, 1997, after class members received letters to report for deportation,[6] Plaintiffs filed an application for a temporary restraining order and a motion for provisional class certification. The temporary restraining order sought to restrain the Defendants from enforcing their policy of pretermitting suspension of deportation applications based on an erroneous interpretation of § 309(c)(5) of IIRIRA as expressed in *Matter of N–J–B,* and to restrain the Defendants from deporting Plaintiffs and class members during the pendency of this action.[7] At the same time, Plaintiffs filed a motion for provisional class certification, seeking to certify the class and subclass as stated in their Complaint. On April 21, 1997, Defendants filed a memorandum of law in opposition to the application for temporary restraining order and in support of a motion to dismiss. On May 1, 1997, Defendants filed their opposition to Plaintiffs' motion for provisional class certification. An evidentiary hearing was held in this matter on May 13, 1997, and argument of counsel on all pending motions was heard on May 14, 1997. At the conclusion of counsel's argument, the Court, in open court in the presence of all parties, orally announced its decision (and the reasons therefor), granting the TRO. On May 20, 1997, this Court entered a formal written Order, embodying its oral decision, denying Defendants' motion to dismiss, certifying the class and appointing lead counsel, granting a temporary restraining order, and setting a preliminary injunction hearing for May 27, 1997. The Court addressed Plaintiffs' and Defendants' jurisdictional arguments extensively in that Order, which are incorporated herein by reference.[8]

## THE TEMPORARY RESTRAINING ORDER

The Court's oral ruling, announced in open court, in the presence of all parties held:

"It is 5:30 in the evening. I suppose we have been at this since about 2:30 this afternoon, roughly, but I suppose that everybody would just as soon find what's

---

6. Plaintiffs' Exs. 2 an 6.

7. Motion for Temporary Restraining Order at 1.

8. Order of May 20, 1997, denying Motion to Dismiss, Certifying Class and Appointing Lead Counsel, Granting Temporary Restraining Order, and Setting Preliminary Injunction Hearing.

going to happen to not only their case, but, in some instances, or, indeed, many instances, their lives.

First, let's turn to a consideration of the motion to dismiss the complaint filed by the Defendant Janet Reno, Attorney General of the United States, et al.

The standard, as we all know for a motion to dismiss, under Federal Rules of Civil Procedure 12(B)6, is whether or not the complaint states a claim, when taken literally with all the averments, is true and correct and accurate.

Eleventh Circuit cases teach us a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. I am citing from an Eleventh Circuit case at 951 F.2d 1238. The Court has concluded after careful examination of all the briefs of the parties and the evidence that's been presented and the legal argument of counsel that it does have jurisdiction in this matter to rule upon this complaint.

The motion to dismiss, therefore, will be and is denied for the following reasons: As counsel for the Plaintiffs have pointed out in their memorandum and brief, there is a strong presumption that actions by any federal agency are judicially reviewable in the federal courts unless expressly mandated otherwise.

The Government has pointed out, quite correctly, the explicit language of Section 242(g), and they rely heavily on Section 106, sub (a), which, on the surface, contains language that is not inconsistent with the position taken by the Government, but which, upon thorough and careful examination and scrutiny, as you all have forced me to do in this case by your well-written and thoroughly prepared briefs, memorandum and argument, impelled the conclusion that Section 242(g), under the circumstances of the issues raised in this complaint, do not bar the Court's consideration and determination of these issues.

This case makes class-wide challenges to I.N.S. policies and does not purport to or attempt to address the merits of individual cases; thus, in this Court's view, it is not precluded by Section 106(a).

The estoppel claims raised in the complaint, the constitutional claims of estoppel are certainly beyond the scope of an immigration judge to review, Board of Immigration Appeals to review, and are, therefore, external to the deportation process envisioned by the jurisdiction of the provisions of the law pertaining to the authority of the immigration judge and the Board of Immigration Appeals.

Therefore, these claims could not be reviewed except here. They could not be reviewed by the Eleventh Circuit Court of Appeals. Certainly, any interpretation of these laws on any record developed in the United States District Court for the Southern District of Florida can be properly, and should be properly, reviewed by the Court of Appeals.

But, without a record, and none can be developed by an immigration judge under the current posture of the interpretation of the law, as articulated by the various decisions of the immigration judges and the Board of Immigration Appeals, there can be no development of a record; therefore, there can be no review.

Section 106(a) does not bar claims, as I've indicated, that the court—that they cannot consider because there is no factual record, or indeed any process by which a record can be developed; so, therefore, the Court of Appeals under its own rules and the law cannot consider those issues.

The only place the Court of Appeals can properly, carefully and thoroughly consider these issues is upon development of a record here in the United States District Court on these constitutional issues which are beyond the pale of the immigration authorities, immigration courts.

Section 242(g) certainly does not, in the opinion of this Judge at least, bar the constitutional claims of estoppel, due process and equal protection. There are constitutionally protected liberty interests when an alien is threatened by deportation that that person should have the opportu-

nity somewhere, some place within our frame of the law, to able to contest, raise or discuss and have determined. I do not believe 242(g) does bar those constitutional claims.

The issue raised by the Government, which is a very interesting and well-reasoned and thoroughly thought out one about exhaustion of administrative remedies, bears comment.

It seems to me that all of the law that is applicable to those cases where it has been held time and again that it is futile to take an issue to a court because that court has already determined or acted upon or pronounced the law to be, or pronounced its position to be, that it does not have jurisdiction to consider an issue come into play.

That is to say, that if it is futile to take an issue to a court, then that matter may be reviewed in the appropriate process of our federal and state system and administrative system without the requirement that exhaustion be fully effected. Exhaustion is futile; it need not be required.

The arguments advanced by whether or not these actions by the immigration judges and the Board of Immigration Appeals are, indeed, actions of the Attorney General of the United States, the Honorable Janet Reno, as advanced by the Plaintiffs, are persuasive.

The arguments advanced by the Plaintiffs that they have been lulled into a change of position and an abandonment of substantial property and liberty rights, at least liberty rights, by being importuned by the Immigration and Naturalization Service to come into the process, abandon their political asylum claims, and apply for suspension hearings and pay the fees that were required for that, that argument makes a lot of sense; it is very persuasive. That certainly is something that the immigration courts have held they have no jurisdiction to consider at this point.

So, going back to basic, basic concepts in all of our jurisprudence, one that we all learn the first year in law school: For every wrong, or let me say for every perceived wrong, there is a remedy.

From what I have heard in this case yesterday and today in a very well articulated legal argument of both sides, there simply is no remedy for the perceived wrongs of these thirty to forty thousand Nicaraguan refugees who are here in this country under this—and are at risk under this procedure, and this new law and the interpretation of this new law as advanced by the Department of Justice.

Therefore, the motion to dismiss is denied. The Court finds and holds that it does have jurisdiction to consider the application for temporary restraining order.

Before turning to that, though, perhaps along with that, it seems that the Court should address the problem of whether or not we are dealing with a class or whether or not we are dealing with two plaintiffs. The Court finds that this record establishes on the pleadings, briefs, memoranda and argument of counsel, based upon all of the testimony that has been taken during the proceeding, and also in considering that the Plaintiffs have satisfied the requirements for class certification under Rule 23 of the Federal Rules of Civil Procedure.

The Court is satisfied that the Plaintiffs are adequate representatives of the class. It is unique and unusual perhaps in the history or time span of a judicial or legal career, that the Court would have some knowledge of the ability of the attorneys who seek to represent the class, this particular class, would have some personal knowledge based upon—a professional knowledge based upon other cases or other matters that have come before the Court.

But as counsel reminded me today, and I have forgotten the number of years, but it's been eighteen years ago that Mr. Kurzban brought a substantial class action or sought class action certification for a substantial number of Haitian refugees.

The Court, having had the experience eighteen years ago, as he reminds me or he tells me, eighteen years ago this month, of observing Mr. Kurzban and his colleagues in that case in their representation of the class, the Court is comfortable and satisfied that the class would be adequate-

ly, I could say well adequately represented, in this matter by Mr. Kurzban and his colleagues in this case.

Another element that the Court has to consider is whether or not there is a predominantly common interest that is indigenous to the class. The Court is satisfied with the showing made by the Plaintiffs in this matter of commonality and typicality in the issues, the legal issues that are raised. As I've said, they are classwide in their assertion; they are not directed individually. And they are the type of common issues that Rule 23 of the Federal Rules of Civil Procedure envision are properly the subject matter of class action treatment.

Mr. Kurzban has cited back to me my own opinions, which is somewhat rude of him, I say facetiously, but I have been here long enough I guess it happens, and it is starting to happen in cases. But he says that I said in the *Haitian Refugee Center* case that the matter in which the entire program is being implemented rather than challenging individual treatment determines the underlying application of class action treatment.

And I think within a framework similar to that we could deal with this problem and thus perhaps save the United States Court of Appeals for the Eleventh Circuit whatever number of thousands or tens of thousands of cases that might otherwise have to go there, provided, of course, that it could be demonstrated that the people could or would take that step and follow that process or procedure.

Therefore, the motion for class action treatment is granted.

I know you are all getting tired of listening, but I suppose we might as well go ahead and decide the only remaining at this point, or the last remaining substantial issue, and that is whether or not a temporary restraining order should issue.

The Court has concluded that it should.

The Plaintiffs in this matter have sought by their pleadings and argument to restrain the Defendants, being the Honorable Janet Reno, Attorney General of the United States, Robert Wallis, District Director of the Immigration and Naturalization Service, the Board of Immigration Appeals, and any persons acting by or under or with their authority, including any employees, staff, counsel or supervisory personnel that act within the framework of any of those administrative agencies, from enforcing the policy of pretermitting suspension of deportation applicants based upon an interpretation of Section 309(c)(5) of the Immigration Reform and Responsibility Act of 1996 as expressed in the *Matter of N–J–B* and the Board of Immigration Appeals 1997, and restraining the Defendants from deporting Plaintiffs and class members during the pendency of this action.

The Court finds that the Plaintiffs have established a substantial likelihood that they will prevail on the merits of their claim with respect to Section 309(c)(5) of the Immigration Reform and Responsibility Act of 1996. And that that section they have made the requisite showing that that does not apply to persons in deportation proceedings.

Secondly, the Court finds that the Plaintiffs and their class members would suffer irreparable harm if denied an opportunity to have a hearing on their claims for suspension of deportation and instead are deported to their home countries.

The Court finds on the basis of this record that the Plaintiffs and their class members would suffer extreme hardship if they are returned to their home countries at this point in time under the status of this case as it now stands.

Three, the Court finds the harm to Plaintiffs substantially outweighs any possible harm to the Defendants from the entry of an injunction. The failure to issue an injunction would result in irreparable harm to the Plaintiffs and the class members. They would be separated in many instances from their families and forced to go to a country where they may or will suffer extreme hardship.

By contrast, the Defendants, if the Plaintiffs prevail ultimately on their claim, will only be required to maintain a process whereby they provide this class before it

was promised to them in the widely disseminated application, widely disseminated notice to Nicaraguan class members to come in and seek a hearing on the suspension—to seek the suspension hearing.

Four, a temporary restraining order would serve the public interest. The Court finds on the basis of this record that the Plaintiffs and the class members herein have lived, worked and raised families in this community and elsewhere and the deportation of these persons would have a devastating impact on not only their lives but the community, the state and perhaps other parts of this nation.

Many of the class members at risk have established homes, settled families, have attended school, worked in the private sector and paid taxes to this community and this state.

The Court finds that the deportation of as many as thirty to forty thousand otherwise possibly eligible Nicaraguan suspension applicants would have an enormous impact on this community.

For all of these reasons, the Court will enter, and does enter, a temporary restraining order as sought by the Plaintiffs in their papers and the Defendants are enjoined from deporting the Plaintiffs and all class members pending further orders of this Court."

In light of the Defendants' insistence that the Court commence a preliminary injunction hearing before expiration of the temporary restraining order, the Court issued an Order on Pending Motions on May 21, 1997, expediting discovery. The Court noted in that Order that, "due to the insistence" of the Defendants, "it is therefore necessary that discovery be expedited in order to insure that a record is fully developed, that Plaintiffs be given an opportunity to fully present their case, and that this Court has all information necessary to render a complete and informed decision on the serious issues before the Court." [9]

On May 27, 1997, the Court commenced the preliminary injunction hearing. The Defendants were unable to fully comply with the discovery within the time period, and Plaintiffs were therefore unable to present a full case on May 27, 1997.[10] On May 27, 1997, after hearing some testimony, the Court entered an Order extending the temporary restraining order through Thursday, June 12, 1997, and referred the matter to the Magistrate Judge to hear the remaining testimony in the case.[11] The extension of the temporary restraining order to June 12, 1997, was consistent with the requirements of Federal Rule of Civil Procedure 65(b).[12]

From May 27, 1997, through June 12, 1997, Plaintiffs and Defendants conducted extensive discovery in this case. Discovery continued during and through the Memorial Day weekend and each and every weekend between those time periods. As the Defendants insisted that they would treat any extension of the temporary restraining order beyond June 12, 1997, as a preliminary injunction subject to appeal, both sides made substantial efforts to complete discovery and hold evidentiary hearings. Evidence was presented before the Magistrate Judge on June 3, 4, 9, 10 and 11, 1997.[13] During this time period, Plaintiffs presented testimony from expert and lay witnesses, including a statistician,[14] the Assistant County Manager of Dade County,[15] several clergymen,[16] prominent members of the Nicaraguan business

---

9. Order on Pending Motion of May 21, 1997, at 2.

10. Order Extending Temporary Restraining Order Through Thursday, June 12, 1997; Order of Reference to Magistrate Judge of May 27, 1997.

11. *Id.*

12. *Id.*

13. Trs. of June 3, 4, 9, 10 and 11, 1997.

14. Testimony of Howard Gitlow, Tr. of June 10, 1997, at 46.

15. Testimony of Jose A. Ojeda, Tr. of June 11, 1997, at 106.

16. Testimony of Monsignor Emilio Vallina and Rev. Ramon Aymerich, Tr. of June 11, 1997.

community,[17] and class members.[18] Previously plaintiffs had presented evidence from a media representative [19] and from attorneys representing Nicaraguan class members.[20] The Plaintiffs also presented substantial documentary evidence in support of their claims.[21] The Court incorporated by reference the Transcript and Exhibits offered at the temporary restraining order hearing.[22] The Defendants presented no live testimony. The documentary evidence they entered was solely directed to what they regarded as the legislative history of § 309(c)(5) of IIRIRA.[23] The Defendants also offered a small number of the named Plaintiffs' depositions as evidence.[24]

## THE MAGISTRATE JUDGE'S RULING AND RECOMMENDATION

After hearing the extensive evidence presented and reviewing the transcripts, Magistrate Judge Brown concluded that the Plaintiffs had established three of the four criteria necessary for a preliminary injunction, ruling:[25]

"That a preliminary injunction is necessary to prevent irreparable harm ... that the injury to the Plaintiffs would clearly outweigh any harm to the non-movant ... [and] that a preliminary injunction would serve the public interest."[26]

## THE PRELIMINARY INJUNCTION EVIDENTIARY HEARING VS. TRIAL

It is easy for the distinction to become blurred between a *preliminary injunction evidentiary hearing* and a *trial* on the entitlement to permanent injunction, because of the similarities between the two proceedings in the trial court. It is imperative however, particularly in the context of the proceedings in this case that the distinction be clearly understood.

The Defendants have, consistently, unequivocally, and respectfully asserted: (1) reliance upon Fed.R.Civ.P. 65(b), mandating automatic expiration of the TRO on June 12, 1997, and if extended beyond the twenty-day period of the Rule, their intention to ask the Court of Appeals to treat the stay as a preliminary injunction; and (2) resisted discovery sought by the Plaintiff class on the theory the Plaintiffs are not entitled to get full discovery since procedurally this case is at the preliminary injunction stage and is not a final permanent injunction trial.

With Defendants applying these two defensive positions as trial strategy (which they had every right to do under the Federal Rules of Civil Procedure), the result was an intense hard-fought struggle by the Plaintiffs, on the one hand, to obtain the evidence they needed and, by the Defendants, on the other hand, to resist discovery by all lawful and proper means.

The twenty days following entry of the Temporary Restraining Order on May 14, 1997, taxed the talents and resources of all counsel far beyond normal professional limits. The parties, and their counsel, literally worked around the clock, through Memorial Day weekend and all other weekends, in their struggle to present (and to resist) a record on the issues for the Court to consid-

---

**17.** Testimony of Roberto Arguello, Tr. of June 3, 1997.

**18.** Testimony of Juan Fuentes, Francisco Palma, William Gaitan and others, Trs. of June 10–11, 1997.

**19.** Testimony of Ana Vazquez Aldana, Tr. of May 27, 1997.

**20.** Testimony of Philip Turtletaub, Douglas Lux, Cheryl Little, Mario Lovo, Tr. of May 13, 1997 and Testimony of Ernesto Varas, Tr. of May 27, 1997.

**21.** Plaintiffs' Exs. 1–82.

**22.** Plaintiffs' Ex. 10A.

**23.** Defendants' Exs. C to H.

**24.** Defendants' Exs. I to R.

**25.** Tr. of June 11, 1997, at 116–17. Magistrate Judge Stephen Brown made no finding as to likelihood of success on the merits because he believed that issue should be considered and determined by an Article III U.S. District Judge. He directed his opinion solely to the other criteria.

**26.** Tr. of June 11, 1997, at 116–17.

er.[27]

Nothing should be inferred from the Court's foregoing recital of the intense activity of counsel that the Court is criticizing Defendants or their counsel for their respectfully stated positions and reliance upon the defenses available to them under the Federal Rules of Civil Procedure and case law.

It does, however, bring into sharp focus the procedural differences between preliminary and permanent injunctions, and the scope of judicial consideration of the evidence necessary to meet the requirements for issuance of a preliminary injunction versus the magnitude of evidence to be considered at a *trial* on the question of issuance of a permanent injunction.

As stated in *University of Texas v. Camenisch*, 451 U.S. 390, 394, 101 S.Ct. 1830, 1833, 68 L.Ed.2d 175 (1981), the preliminary injunction prerequisite factor of "likelihood of success" on the merits must not be improperly equated with "success" on the merits. Blending "likelihood of success" with "success" would be particularly wrong in the case at bar, given the defense strategy of resisting discovery on the claim that the Plaintiffs are not entitled to get full discovery at this preliminary injunction stage.

### LEGAL REQUIREMENTS FOR PRELIMINARY INJUNCTION RELIEF

■ The Court has applied the traditional four-part test for determining whether a *preliminary injunction* is appropriate, as articulated most recently in *Warren Publishing, Inc. v. Microdos Data Corp.*, 115 F.3d 1509, 1516–17 (11th Cir.1997). To succeed, the Plaintiff class must show: (1) that there is substantial likelihood of success on the merits, (2) that the preliminary injunction is necessary to prevent irreparable injury, (3) that the injury to the Plaintiff outweighs any harm to the non-movant, and (4) the preliminary injunction would serve the public interest.

The Fifth Circuit Court of Appeals in *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 576–77 (5th Cir.1974) suggested guidelines to be applied by district courts considering preliminary injunction applications in the following language:

First and foremost, we reemphasize the importance of the general requirements for a preliminary injunction. It is an extraordinary remedy, not available unless the plaintiff carries his burden of persuasion as to all of the four prerequisites. The primary justification for granting a preliminary injunction is to preserve the court's ability to render a meaningful decision after a trial on the merits.

It is often loosely stated that the purpose of a preliminary injunction is to preserve the status quo.

\*　\*　\*　\*　\*　\*

It must not be thought, however, that there is any particular magic in the phrase "status quo." The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits. It often happens that this purpose is furthered by preservation of the status quo, but not always. If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, *Ross–Whitney Corp. v. Smith Kline & French Laboratories* (9th Cir. 1953), 207 F.2d 190, by the issuance of a

---

**27.** For example, the Immigration and Naturalization Service, according to their pleadings, resisting Plaintiffs' motion to hold them in contempt for failure to give discovery in compliance with this Court's order, asserted that they had incurred approximately $18,000 in overtime payment to scores of staff employees, in a good faith attempt to comply with the Court's order. The same pleadings also reflected that they were not able to gather the information and furnish it to Plaintiffs in timely fashion. The record also reflects that the Department of Justice dispatched attorneys from Washington to assist Mr. Dexter Lee, lead counsel, in processing the six appeals from Magistrate Judge Brown's discovery orders entered during this twenty-day phase, and to assist in the preparation of the voluminous briefs and documents filed herein.

Counsel for the Plaintiff class labored under a similar, or perhaps even greater, handicap, working with more limited resources and carrying the burden of establishing the record.

mandatory injunction, see 7 Moore's Federal Practice Chapter 65.04[1], or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury. The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo. The parties have not made a major issue of the requirement that plaintiff demonstrate a substantial likelihood of prevailing on the merits, and the various court orders do not discuss the issue. However, it is important to consider this requirement, since, regardless of the balance of relative hardships threatened to the parties, the granting of a preliminary injunction would be inequitable if the plaintiff has no chance of success on the merits. The importance of this requirement varies with the relative balance of threatened hardships facing each of the parties.

Although a showing that plaintiff will be more severally prejudiced by a denial of the injunction than defendant would be by its grant does not remove the need to show some probability of winning on the merits, it does lower the standard that must be met. Conversely, if there is only slight evidence that plaintiff will be injured in the absence of interlocutory relief, the showing that he is likely to prevail on the merits is particularly important. Wright & Miller, Federal Practice and Procedure: Civil § 2948. In this context, the district court should consider the relevance of *Gulf Oil Corp. v. Morton* (9th Cir.1973), 493 F.2d 141.

Applying these principles, we turn to consideration of the four-part test.

## I. LIKELIHOOD OF SUCCESS ON THE MERITS

The Plaintiff class contends that the interpretation that § 309(c)(5) of IIRIRA[28] be applied retroactively is erroneous. The interpretation of § 309(c)(5) is embodied in the various memoranda of the Office of the Attorney General, the office of the General

Counsel of INS, and other decision making and high-ranking officials of the offices of the several Defendants. The retroactivity application interpretation by the Defendants is also embodied in the seven-to-five majority opinion of the Board of Immigration Appeals in the *Matter of N–J–B*, Interim Decision No. 3309, 1997 WL 107593 (BIA 1997).

Conversely, the Defendants' extensive memorandum of law in opposition to the class application for preliminary injunction takes the position that Congress, not the Defendants in this litigation, legislated the retroactivity of § 309(c)(5).

Additionally, the Plaintiff class has presented substantial evidence (even at this preliminary stage of the proceedings in this case) supporting their challenge to the Defendants' interpretation of IIRIRA upon due process, equal protection of law, and estoppel claims. These issues will be addressed at a subsequent portion of this opinion.

Turning first to whether Plaintiffs have met the requisite burden of proof of likelihood of success on the merits on their contention of the erroneous interpretation by Defendants of IIRIRA, the issue is whether the Act was meant to be applied retroactively to cut off the seven years of physical presence needed to qualify for suspension of deportation.

Any deportation and exclusion proceedings ongoing prior to April 1, 1997, continued unchanged under IIRIRA, including ongoing suspension of deportation proceedings under § 244 of the former Immigration and Nationality Act ("INA"). IIRIRA 309(c)(1). Suspension of deportation under former § 244 required that a person have seven years of physical presence to be eligible for this relief. Persons who were in deportation proceedings prior to April 1, 1997, such as the class members in this case, could continue to apply for suspension of deportation under former § 244, and have their cases adjudicated under the old law.

---

**28.** The section states: "Transitional Rule with Regard to Suspension of Deportation. Paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act (relating to continuous residence or physical presence) shall apply to notices to appear issued before, on, or after the date of the enactment of this Act."

Two exceptions to continuing under the old law provision were written into IIRIRA. Sections 309(c)(2) and (3) allow the Attorney General to elect to place persons who were in deportation proceedings into the new removal proceedings under certain circumstances. Additionally, a "transition" rule provided that the new § 240A(d)(1) will cut off physical presence if the respondent is "served with a notice to appear under § 239(a)." This transition provision applies "to notices to appear issued before, on, or after the date of enactment" of IIRIRA. IIRIRA § 309(c)(5).

On October 3, 1996, the INS General Counsel issued a memorandum interpreting § 309(c)(5) to apply retroactively to persons in suspension of deportation proceedings. This analysis starts with the assumption that an *order to show cause* is identical to a *notice to appear*, thus service of an order to show cause cuts off physical presence in the United States. A majority on the Board of Immigration Appeals agreed with this interpretation several months later in *Matter of N–J–B*, thereby building upon the original erroneous assumption.

On the basis of the record as compiled before this Court during the proceedings at both temporary restraining order and preliminary injunctive hearings, careful analysis of the legal authorities cited by counsel for the respective parties, and a plain reading of the statutory language impelled the conclusion that the Defendants' original assumption and ultimate interpretation is wrong.

Section 309(c)(5) incorporates the provisions of § 240A(d)(1), which reads:

"(d) Special rules relating to continuous residence or physical presence.

(1) Termination of continuous period.

For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end when the alien is served a notice to appear under § 239(a) or when the alien has committed an offense referred to in § 212(a)(2) that renders the alien inadmissible to the United States under § 212(a)(2) or removable from the United States under § 237(a)(2) or 237(a)(4), whichever is earliest."

Clearly, the above-quoted section does not terminate the period of continuous physical presence necessary for suspension until "*when* the alien is *served* a notice to appear under Section 239(a)." (Emphasis added.) Defendants' interpretation, firstly, overlooks the service requirement of § 240A(d)(1).

Secondly, Defendants' interpretation of § 309(c)(5) changes the plain language of § 240A(d) requiring *service* upon an alien to simply *issued* after the date of enactment of the new law (September 30, 1996). The Defendants' analysis and interpretation of § 309(c)(5) relies upon an interpretation that the old "Order to Show Cause" and the new "Notice to Appear" are identical. An Order to Show Cause, particularly prior to 1992, was a very different instrument from the current Notice to Appear.

The Court finds that a prior-issued Order to Show Cause can terminate a suspension applicant's physical presence only when and if the Attorney General elects to apply the new law to those persons under §§ 309(c)(2) or (3), and actually or constructively serves the applicant with a Notice to Appear under § 239. Since neither § 240A(d)(1) nor § 309 took effect until April 1, 1997, no such designation by the Attorney General of the United States has taken place.

 It is a basic canon of statutory interpretation that legislative purposes are expressed by the ordinary meaning of the *words* used. *INS v. Phinpathya*, 464 U.S. 183, 191–92, 104 S.Ct. 584, 590–91, 78 L.Ed.2d 401 (1984); *Ardestani v. INS*, 502 U.S. 129, 135–37, 112 S.Ct. 515, 519–21, 116 L.Ed.2d 496 (1991). In statutory interpretation, it is clear that each word is given its proper and usual meaning with no word stricken as surplusage. *Kungys v. United States*, 485 U.S. 759, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988); *U.S. v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955). Also, statutory sections must be construed harmoniously so as to give effect to each section. *Coit Independence Joint Venture v. Federal Savings and Loan Insurance Corp.*, 489 U.S. 561, 573, 109 S.Ct. 1361, 1368–69, 103 L.Ed.2d 602 (1989). Review of the legislative history of this Act, considered in light of the analysis of the

respective parties in their thoroughly written briefs in this case, brings one to the conclusion that Congress did not intend for § 309(c)(5) to be interpreted so broadly as to eliminate the right of aliens to apply for suspension of deportation where they played no role in delaying their cases.

The Court's interpretation of this statute is supported by the testimony of Mr. Peter Deutsch, a member of the United States House of Representatives from District 20 in the State of Florida. Congressman Deutsch voted for IIRIRA, including § 309(c)(5), but testified that the interpretation of the Defendants was not contemplated by the legislation. Congressman Deutsch stated that "our feeling was that the interpretation by the Board was an incorrect interpretation. I'm someone who actually voted for the legislation, but I don't think really anyone contemplated that the legislation would have specifically changed the issue of suspension ... I don't think anyone who voted on this legislation contemplated the effect of the ruling ... If this was something that Congress wanted to occur we wouldn't be debating this issue now. It would have been expressed much more clear in the legislation." [29] Congressman Deutsch's sentiments were also expressed in a letter that he and other members of Congress sent to the Attorney General of the United States. [30]

### THE DUE PROCESS CLAIM

■ Turning to a consideration of whether the Plaintiff class has established a likelihood of success on the merits on their due process claim of deprivation of their right to a *hearing* on their claim for suspension of deportation, the record establishes Plaintiffs' reliance on a myriad of statutes, regulations, administrative policy and official conduct giving rise to due process property and liberty interests.

The Defendants initiated a policy in May and June of 1995 that was designed to induce and encourage Nicaraguan class members to come forward and submit applications for suspension of deportation. [31] The purpose of this special program was to induce Nicaraguans to come forward and to apply for, and pay fees for, suspension of deportation. In order to accomplish the goal of inducing and encouraging Nicaraguans to come forward, the INS specifically set out to offer them a benefit not given to other nationals. To encourage Nicaraguans to file motions to reopen and applications for suspension of deportation, they were informed that they would be given work authorization upon the filing of motions to reopen—a benefit not accorded other nationals. In her memo to the field, Joan Higgins, Assistant Commissioner for Detention and Deportation, stated that special treatment would be accorded Nicaraguans who filed motions to reopen and sought suspension of deportation. She stated: "In order to be eligible for suspension of deportation, under normal circumstances, such an alien must have a motion to reopen their immigration hearing *granted* by the Executive Office for Immigration Review (EOIR). However, in order to avoid lapses in employment authorization for Nicaraguans who appear eligible for suspension, the INS will accept employment authorization applications from Nicaraguans with final orders of deportation provided they submit evidence that they have filed—*not been granted*—a motion to reopen in conjunction with an application for suspension of deportation...." [32] Similarly, local INS officers in the Miami District noted in drafts concerning the new suspension program that, "normally this [a motion to reopen] must be granted before INS considers the application properly filed for purposes of work authorization eligibility...." [33] Even Gerri Ratliff, Counsel to the Deputy Attorney General, in a draft memo to various persons in the Department of Justice, acknowledged the special inducement that the INS provided to Nicara-

---

**29.** Testimony of Congressman Peter Deutsch, Tr. of May 13, 1997, at 14.

**30.** Plaintiffs' Ex. 1.

**31.** Plaintiffs' Exs. 16, 17, 18, 39, 51, 52, 58, 59, 61, 62, 63, 69, 76, and 78.

**32.** Plaintiffs' Ex. 16.

**33.** Plaintiffs' Ex. 77.

guans to make them come forward to pay fees and apply for suspension of deportation. She stated that: "Without this new policy, INS would not grant the motion to reopen, which could take several months ..." [34] The policy was published in the Federal Register, thus providing notice to the world as to the special policy for Nicaraguans.[35] The notice stated that "specifically, the INS will treat the filing of a motion to reopen deportation proceedings accompanied by an application for suspension of deportation as a sufficient basis upon which such a person may apply for work authorization." The matter was also widely publicized in the press.[36] The INS' policy was also distributed in the mass media via television programs that cover 99% of Hispanic households in Dade and Broward Counties.[37]

In addition, INS established a policy of not opposing any motion to reopen that was filed by Nicaraguans. David Martin, General Counsel of the Immigration and Naturalization Service, sent a letter to Paul Schmidt, Chairman of the Board of Immigration Appeals, that stated that "the Service has reconsidered its position regarding motions to reopen filed by Nicaraguans since the phaseout of the Nicaraguan Review Program.... The Service has determined that it will not oppose a motion to reopen to apply for suspension of deportation if the alien appears to be statutorily eligible for that relief.... Upon the filing of a motion to reopen the Service may grant work authorization upon finding that the physical presence requirement for suspension of deportation has been met."[38] During the same time period, memos were sent out to trial attorneys around the United States "not to oppose MTR's (motions to reopen) filed by Nicaraguans who are eligible for suspension."[39]

This policy was also reinforced by the Defendant BIA because it developed a far lower standard for reopening Nicaraguan cases than those of other nationals. *Matter of L-O-G*, Interim Decision No. 3281 (BIA 1996) ("Given the fact the Service has taken no action to deport these respondents and indeed, indicated its acquiescence in the filing of suspension of deportation applications by similarly situated individuals, we find no reason to deny reopening as a matter of discretion".)

When this program during the first year resulted in only approximately 2,500 [40] Nicaraguans reopening their cases, the INS increased its efforts. INS not only republished the notice in the Federal Register, extending the program to June 12, 1997,[41] but it initiated an extensive media promotion. The Defendants also circulated the notice to *Interpreter Releases*, a journal widely read by immigration lawyers throughout the United States.[42] They developed fact sheets to submit to the press and the public.[43] They developed a question-and-answer sheet for "media guidance."[44] The Commissioner herself sent letters to community leaders such as Haydee Marin, stating that the Defendants had decided to extend the program through June 12, 1997, because "this will allow advocates for and within the Nicaraguan community in the United States additional time to publicize the opportunity to file for suspension of deportation and to secure legal assistance for eligible Nicaraguans."[45]

At the local INS office, special procedures were established to notify Nicaraguans that they should apply for suspension of deportation.[46] Even Nicaraguans who were taken

---

34. Plaintiffs' Ex. 69.

35. Plaintiffs' Ex. 18.

36. Plaintiffs' Exs. 39 and 46.

37. Plaintiffs' Ex. 37; Testimony of Ana Vazquez-Aldana at 129.

38. Plaintiffs' Ex. 15.

39. Plaintiffs' Ex. 54.

40. Plaintiffs' Ex. 69 at 1–2.

41. Plaintiffs' Ex. 25.

42. Plaintiffs' Ex. 57.

43. Plaintiffs' Exs. 22 and 23.

44. Plaintiffs' Ex. 24.

45. Plaintiffs' Ex. 10.

46. Plaintiffs' Ex. 18A.

into detention would be released and allowed to apply for suspension of deportation if they had seven years at that time.[47] People were also given specific instructions by INS at Miami on how and under what circumstances to file motions to reopen.[48]

While the Government was liberally granting these motions to reopen if Nicaraguan nationals paid the fees, they were also approving their suspension of deportation applications in South Florida at a rate significantly higher than normal for INS. By February, 1996, approval rates were as high as 87% in Miami, and 81% nationwide.[49] These extraordinarily high rates would unquestionably induce people to come forward when compared with the 60% approval rate nationwide for non-Nicaraguans.[50]

The Government's policy and conduct without question created an expectation in the Nicaraguan community, even absent the statutory right to seek suspension of deportation. Nicaraguans in substantial numbers paid the $280 fee to reopen their cases and apply for suspension and employment authorization. Nicaraguans came forward in substantial numbers with the expectation that they "just had to file, do the paperwork, file what was necessary, the case would be open, I would have my day in court."[51] The number of Nicaraguan suspension applications during this period increased dramatically. Between June 13, 1995, and February 21, 1997, (the date that *Matter of N–J–B* was issued), there was a 557% increase in the number of Nicaraguan suspension applications that were filed.[52] Howard Gitlow, a statistician who analyzed the number of suspension applications for Nicaraguans and non-Nicaraguan class members, presented evidence at the preliminary injunction hearing, demonstrating the dramatic increase in the applications. In addition to the 557% increase in applica-

tions that were filed during the suspension of deportation program for Nicaraguans, there was a 650% decrease in the applications when comparing the time period June 13, 1995, to February 21, 1997, and post-February 21, 1997. Mr. Gitlow compared non-Nicaraguans for the same period of pre- and post-June 13, 1995, and found that Nicaraguan applications increased 239% more than applications of non-Nicaraguans. In analyzing motions to reopen, he found that during the pre-June 13, 1995, and post-June 13, 1995, periods, there was a 315% increase in applications, and a 2,000% decrease subsequent to February 21, 1997, when *Matter of N–J–B* was publicly announced. Mr. Gitlow testified that there was a precipitous rise in applications during the June 13, 1995, to February 21, 1997, period, and a precipitous decline in applications subsequent to that period.[53]

As the result of the program to induce Nicaraguans to come forward, the Nicaraguans paid substantial fees to the Immigration and Naturalization Service. Haydee Marin estimated that the fees solely for the applications for suspension of deportation and motions to reopen were over $1.5 million. Mr. Gitlow did a cluster sample of fees paid during the period June 13, 1995, to February 21, 1997. He determined that the total amount paid in Miami alone was a minimum of $1.161 million. He stated that if there were other files that could be reviewed, the amounts could go as high as $1.4 or $1.7 million. The Plaintiffs also made a financial commitment to their cases, not only in the fees they paid to the INS, but also in the substantial attorneys' fees and other resources that were necessary to reopen their cases.[54]

Numerous witnesses testified that they came forward and applied for suspension.

47. *Id.*

48. Testimony of Philip Turtle Taub, Tr. of May 13, 1997, at 38.

49. Plaintiffs' Exs. 19 and 63 at page 3.

50. Plaintiffs' Ex. 72 at 4 [Memo to Attorney General of 2/27/97 at page 3 of the document].

51. Testimony of Philip Turtletaub, Tr. of May 13, 1997, at 44–45.

52. Expert testimony of Howard Gitlow, Tr. of June 10, 1997, at 54.

53. *Id.*

54. Testimony of Philip Turtletaub, Tr. of May 13, 1997, at 59.

Ms. Olga Lazo said that she applied based on the news reports because "we were almost 100% sure that we really had suspension."[55] As a result of coming forward, the Nicaraguan class members gave up substantial benefits. Many of them gave up their right to continue to seek political asylum in the United States.[56] At the time of these hearings the INS estimated that there were approximately 15,200 long-term asylum applications pending, of which 80% would be facially eligible for suspension because they were here for seven years or more.[57]

There is no doubt that the Government's conduct created a substantial expectation in the community that, when coupled with the statutory right to seek asylum, created a property or liberty interest in the right to a hearing on their claims for suspension of deportation. On February 21, 1997, as a result of the change in policy by the Defendants, Plaintiffs were deprived of the right to have a hearing on their claims for suspension of deportation. As a result of the change of policy, class members had their applications for suspension of deportation "pretermitted."[58] Class members were denied suspension of deportation.[59] The BIA began dismissing appeals because *Matter of N–J–B* pretermitted their cases.[60] Class members whose cases are now pending will be subject to pretermission.[61] One lawyer testified that over 250 clients of his were no longer eligible

for suspension of deportation in light of the Defendants' change of policy.[62]

The Defendants' policy is to continue to initiate deportation proceedings.[63] Ms. Little testified that in a meeting with Robert Bach, INS Executive Associate Commissioner for Policy and Planning, she was informed that INS would execute deportation orders. This is reflected in the Government's issuance of "bag and baggage" letters, which are notices to appear to be physically removed from the United States. These letters have been given to class members.[64]

■ An interpretation of a statute that has the effect of barring completely access to the courts irrespective of the merits of a person's claim has been held to· violate due process. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982); *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). A retroactive application of § 309(c)(5) violates due process by barring persons completely from even applying for suspension of deportation.

Deportable aliens, such as Plaintiffs and class members, have long been recognized as having full due process rights. *Bridges v. Wixon*, 326 U.S. 135, 152, 65 S.Ct. 1443, 1451–52, 89 L.Ed. 2103 (1945); *Ibrahim v. INS*, 821 F.2d 1547, 1550 (11th Cir.1987). In paying fees to the government for an application, the Plaintiffs and class members have a

---

55. Testimony of Olga Lazo, Tr. of June 3, 1997, at 91.

56. Testimony of William Gaitan, Tr. of June 10, 1997, at 65; Testimony of Olga Lazo, Tr. of June 3, 1997, at 91; Testimony of Douglas Lux, Tr. of May 13, 1997, at 119–21; Testimony of Dudley Rocha Petterson, Tr. of May 27, 1997 at 153–54; Testimony of Khadijeh Aidinezhad, Tr. of June 3, 1997, at 48.

57. Plaintiffs' Ex. 81.

58. Testimony of Philip Turtletaub and Douglas Lux, Tr. of May 13, 1997, at 30 and 106.

59. Plaintiffs' Ex. 41 is a small sample of the number of class members denied suspension of deportation.

60. Plaintiffs' Exs. 33 and 42 are a small sampling of the class members who have BIA decisions dismissing their cases.

61. Plaintiffs' Ex. 43 is a sample of those cases. *See also* Testimony of Maria Esperanza Vargas Chavaria, Tr. of May 27, 1997; Testimony of William Gaitan, Tr. of June 3, 1997; Testimony of Dudley Rocha Pettersen, Tr. of May 27, 1997.

62. Testimony of Philip Turtletaub, Tr. of May 13, 1997 at 42.

63. Testimony of Cheryl Little, Tr. of May 13, 1997, at 90.

64. Plaintiffs' Exs. 2 and 6. Congressman Peter Deutsch also testified that the INS had not stopped deportations, and that he had talked with persons who had received bag and baggage letters. Testimony of Congressman Peter Deutsch, Tr. of May 13, 1997, at 17.

property interest in obtaining a hearing on their applications.

▮ This record establishes that persons who came forward, who were placed in deportation proceedings prior to seven years of presence (but had their hearing after seven years), and who then won their suspension case are now being denied the right to seek suspension of deportation, even if they have now been in the United States for more than seven years. Conversely, someone who evaded INS successfully for seven years is eligible for suspension of deportation. The latter person is eligible even if he has been here less time than a person who has been served with an Order to Show Cause but where INS took no action to deport the person until many years after the seven years were reached. Any scheme which grants relief to persons who did not come forward and denies relief to persons who did come forward is irrational and in violation of equal protection. Similarly, any analysis which turns on whether someone is served with a charging document, even if the actual hearing does not occur for many years thereafter, is irrational and violates equal protection.

As the evidence at the hearings before this Court demonstrated, the Defendants' policy produced conflicting results. Douglas Lux, a lawyer representing hundreds of Nicaraguan clients, testified that he has clients who have been granted suspension who have been in the United States for seven years, and others who have been denied suspension who have been here for 14 years or more, because of *Matter of N–J–B.* Similarly, Plaintiffs who had their application for suspension pretermitted under *N–J–B* have been here 12 years,[65] 11 years,[66] and 10 years.[67] There was also testimony of families who came during the same year where, in one case, the

husband's application was pretermitted because he was issued an order to show cause before seven years,[68] and where, in another case, the wife and children were pretermitted because they were served with orders to show cause within seven years while the husband was not.[69] A witness testified concerning the applications of a husband, wife and children heard together before an Immigration Judge, in which the husband and children were granted suspension of deportation, but the wife's application was pretermitted because she was served with an order to show cause prior to the seven years.[70] Distinctions such as these are wholly irrational and not related to any legitimate governmental interest. This is particularly so in light of an overriding congressional interest under the Immigration and Nationality Act in unifying families. *See generally* INA § 201(a)(1) and (b)(2)(A)(i).

Equal protection is also offended when distinctions are drawn between Nicaraguan and other potential applicants for suspension. The Defendants induced only Nicaraguans to come forward and apply for suspension thereby targeting them for unlawful treatment. By establishing a special program that targeted Nicaraguans and that ultimately resulted in their being ordered deported, the Defendants have violated due process. *Yeung v. INS,* 76 F.3d 337 (11th Cir.1995); *Garberding v. INS,* 30 F.3d 1187 (9th Cir. 1994); *Francis v. INS,* 532 F.2d 268 (2nd Cir.1976).

### THE ESTOPPEL CLAIM

▮ The traditional elements of estoppel are: (1) a misrepresentation by another party, (2) which has been reasonably relied upon, (3) to the claimant's detriment. *Pinnacle Port Community Assn., Inc. v. Orenstein,* 872 F.2d 1536, 1542 (11th Cir.1989);

---

**65.** Testimony of Ms. Aidinezhad, Tr. of June 3, 1997, at 45; Ms. Largaespada, Tr. of June 11, 1997, at 4; Mr. Rivas, Defs.' Exhibit P at 8; and Ms. Portillo, Defs.' Exhibit O at 7.

**66.** Testimony of Roberto Tefel Defs.' Exhibit R at 5; Testimony of Palma, Tr. of June 10, 1997, at 30.

**67.** Testimony of Dudley Rocha Pettersen, Tr. of May 27, 1997, at 144.

**68.** Testimony of Dudley Rocha Pettersen, Tr. of May 27, 1997, at 154.

**69.** Testimony of William Gaitan, Tr. of June 10, 1997, at 66.

**70.** Testimony of Mirna Largaespada, Tr. of June 11, 1997, at 10.

*United States v. Asmar,* 827 F.2d 907, 912 (3d Cir.1987).

The Defendants suggest in their brief at page 27, that a fourth element of estoppel must be established and proven by a party asserting this theory against the government, namely affirmative misconduct.

The Plaintiff class takes the position in its brief (page 45) that the Eleventh Circuit has declined to adopt this fourth element of affirmative misconduct as the burden of proof for a party asserting estoppel against the government. The Defendants seemed to agree with this analysis at page 27 of their brief, citing *Chiles v. Thornburgh,* 865 F.2d 1197, 1202 (11th Cir.1989); *Brundidge Banking Co. v. Pike County Agrig. Stabiliz. and Conserv.,* 899 F.2d 1154, 1161 n. 5 (11th Cir. 1990); *Eagle v. Sullivan,* 877 F.2d 908, 912 n. 7 (11th Cir.1989).

Regardless of whether the fourth element of estoppel has been recognized by the Eleventh Circuit, and therefore must be applied in this case, or not, Plaintiffs contend that all the elements of estoppel have been met in this case (Brief, p. 45).

■ Plaintiffs' contention, and the evidence they were able to present at this very preliminary stage of this case, relies upon the fact that the Defendants, while inducing and encouraging Nicaraguans to apply for the special Review Program in June 1995, and subsequently extending the policy until June 1996, did so with knowledge that Congress was considering drastic changes in the suspension laws which would eliminate the right of Nicaraguans to obtain suspension.

This special Nicaraguan Review Program notified Nicaraguan nationals that if they had seven or more years of physical presence in the United States, they might be eligible for relief from deportation by applying for suspension of deportation.[71]

Mr. Anthony C. Moscato, Director of the Executive Office for Immigration Review, testified that he was aware as early as June of 1995 that Congress was considering proposals that "would drastically reduce or eliminate the right of people to seek suspension of deportation."[72] Mr. Moscato had cleared his testimony with supervisors in the Department of Justice, including the Office of Legislative Affairs.[73] His testimony was consistent with his earlier testimony before Congress, where he expressly recognized that "suspension of deportation is drastically curtailed," under Congress' proposal in H.R. 1915.[74] The Defendants knew that Congress was making these proposals as early as June of 1995, at the time that they announced the suspension of deportation program and publicized it in the Nicaraguan community. The Defendants continued to publicize and induce Nicaraguans to come forward to apply for relief which Defendants could reasonably have known would not be available. The Defendants wrote to Congressman Gephardt on March 13, 1996, supporting this treatment of § 309(c)(5),[75] while continuing to promote and induce Nicaraguans to come forward for the next year. Plaintiffs argue that Defendants were willing to "go along" with the proposal to cut off the right of the same Nicaraguans who they were inviting to come forward to make such applications.

The Defendants were well aware by June 1995 that there was a substantial likelihood that suspension of deportation in one manner or another would be "drastically curtailed." They did not disclose this to the Nicaraguans and, in fact, continued during all of 1995 and 1996 to encourage and induce Nicaraguans to pay the fees and to come forward seeking suspension of deportation. This action by INS affirmatively induced Nicaraguans to apply for due process suspension hearings, knowing that, in all probability, they would

71. The Nicaraguan Review Program was to originally end June 12, 1995. The Defendant INS instituted an additional one-year period for allowing Nicaraguans who had final orders of deportation prior to June 13, 1995, the opportunity to apply. At the end of this one-year period, the INS extended the transition period for one more year until June 12, 1997.

72. Testimony of Anthony Moscato at Plaintiffs' Exhibit 49 at 6.

73. *Id.* at 7.

74. Plaintiffs' Ex. 34.

75. Defendants' Mem. at 16; Defendants' Ex. B4 at 38.

never have an opportunity to obtain the relief they were induced to request.

INS had already interpreted the new law concerning the time required for physical presence to be of retroactive application at least three months prior to BIA's announced opinion in *N–J–B.*

A memorandum dated November 29, 1996, (unsigned) from Robert A. Wallis, INS' acting district director in Miami, to Thomas C. Leupp, INS' acting Eastern regional director stated:

> The recent changes in Immigration Law have dramatically limited the opportunity for adjustment of status which has adversely affected a large number of the Nicaraguan cases in the category 3 docket in Miami.
>
> Moreover, guidance issued by General Counsel now dictates that *motions to reopen for the purpose of filing for suspension of deportation are to be opposed where, as in the case under review, the order to show cause was issued prior to the alien's accrual of the required physical presence requirement.*

(Pls.' Ex. 52 at 2) (emphasis added). The Court has not found anything in the record, including in acting District Director Wallis' deposition, that elucidates the point that INS apparently knew before the BIA ruled in *N–J–B* that the new, more restrictive physical presence requirement would apply retroactively, thus rendering ineligible for suspension tens of thousands of previously eligible class members.

Plaintiffs assert that Defendants' acts and conduct go beyond mere misrepresentation and reach the level of affirmative misconduct, citing *Akbarin v. INS,* 669 F.2d 839, 842 (1st Cir.1982). The Court does not, at this time, consider the District Director's statement to be a "smoking gun" on the Plaintiffs' estoppel argument. But the exhibit does raise questions about INS policy at the time they were encouraging Plaintiffs to seek suspen-

sion. It supports Plaintiffs' contention that they deserve a full opportunity to take discovery in the case and that they should not be shackled with the expedited discovery necessitated by Defendants' insistence that the preliminary injunction hearing proceed immediately. District Director Wallis' statement is an example of the type of evidence that Plaintiffs should be permitted to develop in reasonable discovery prior to trial.

With reference to the other prongs of the estoppel claim, it appears from the evidence presented thus far that Plaintiff class members relied on the representations made by the Defendants. An unresolved issue, looming large as an issue to be developed in discovery and at trial, is the serious question of whether the representations that were unquestionably made by Defendants, were intentional *mis*representations.

The Plaintiffs paid substantial fees,[76] and in many cases withdrew their applications for political asylum.[77] The Plaintiffs filed these applications in extraordinarily large numbers. During the relevant time period there was a 557% increase in the number of Nicaraguan suspension applications. This represented a 239% increase over applications of non-Nicaraguan class members.[78]

There is also no question that Plaintiffs and class members relied on the Defendants' representations to their detriment. They paid substantial fees to the Government and to attorneys to represent them in a suspension hearing that they never received or which has now been taken away from them by Defendants' policy.[79]

The detriment to Plaintiffs and class members also occurred in a far more profound way than simply by the payment of funds they could ill afford. After learning of the program, their hopes and expectations of remaining in the United States were raised and

---

76. Testimony of Howard Gitlow, Tr. of June 10, 1997, at 52; Testimony of Haydee Marin, Tr. of May 13, 1997, at 180.

77. Testimony of William Gaitan and others.

78. Testimony of Howard Gitlow, Tr. of June 10, 1997, at 54.

79. Testimony of Philip Turtletaub, Tr. of May 13, 1997, at 59; Testimony of Douglas Lux, Tr. of May 13, 1997, at 119–21.

then dashed by the Defendants' change in policy.[80]

The Defendants, although given a full opportunity to present live testimony through witnesses at both the hearing on temporary restraining order and preliminary injunction, declined to do so. As set forth in the earlier portion of this opinion, the Defendants relied instead upon the introduction of documentary exhibits primarily dealing with the subject matter of the legislative history of IIRIRA. The testimony of the Plaintiff class is largely, if not entirely, uncontradicted.

The Plaintiffs have chosen to rely instead upon their interpretation of § 309(c)(5) pertaining to retroactivity of the new Act, as well as their oft-stated assertion that the United States District Court has no jurisdiction in this matter. The Defendants rely upon legal analysis and oral argument of their theories of law, as contrasted with the presentation of live witnesses, to establish their position.

With respect to the estoppel claim of the Plaintiffs, and whether or not the Plaintiffs have a likelihood of success on the merits on this issue, defense counsel raises the following theories: (1) the Plaintiff class relied upon their own attorneys and not the widespread announcement of the Nicaraguan Review Program for information regarding motions to reopen their applications, (2) the Plaintiffs would have been subject to deportation anyway, so there is no detrimental reliance upon the Program so widely publicized by INS, (3) the Plaintiffs could have gone to immigration judges concerning their estoppel claim (citing *Matter of Hernandez[Puente]*, 20 I. & N. Decision 335, 338, 1991 WL 353520 (BIA 1991)), and (4) Plaintiffs' estoppel claims must be made in the Circuit Court of Appeals by petition for review from administrative judge rulings (not in the U.S. District Court).

The Plaintiff class has correctly pointed out that, with respect to the source of information, the testimony of Leonel Martinez (Defs.' Ex. L at 49) and the testimony of Ignatio Herrera (Defs.' Ex. K at 34) established that some of the Plaintiffs obtained information directly from the Defendants about the Program. Further, the record establishes that the Defendants used announcements through the news media, met with community leaders and urged them to announce the Program, and published in the Federal Register notification of the Program. The Defendants exercised great effort to advise all interested parties with the widest possible dissemination of information what they were inviting the Plaintiffs to do respecting applications for suspension of deportation.

Regarding Defendants' theory that the Plaintiffs were subject to deportation anyway, and therefore suffered no detrimental reliance, the record is clear that many of the Plaintiffs were not subject to deportation. A number of other Plaintiffs withdrew their claims for political asylum and submitted applications for suspension, according to the testimony of William Gaitan (Tr. of June 10, 1997, at 65), and the testimony of Dudley Rocha Pettersen (Tr. of May 27, 1997, at 149).

With respect to the BIA case of *Hernandez[Puente]*, the decision states: "The Board itself and the Immigration Judges are without authority to apply the doctrine of equitable estoppel against the Service so as to preclude it from undertaking a lawful course of action that it is empowered to pursue by statute and regulation." Mario Lovo testified, (Tr. of May 13, 1997, at 161), that an equitable estoppel claim could not be raised before the Immigration Court in any form whatsoever.

■ Lastly, with respect to the legal theory of Defendants' counsel that these claims should be presented in the first instance to the United States Court of Appeals, Plaintiffs rely upon *Abedi–Tajrishi v. INS*, 752 F.2d 441, 443 (9th Cir.1985), wherein this argument was rejected. There, the Ninth Circuit found that an allegation of affirmative misconduct by INS raised factual issues that had not been given an adequate hearing in the Immigration Court, and held that the proper forum to seek review was the United States District Court, where a hearing could be

80. *Id.*

conducted, enabling the creation of a factual record. Clearly, the Court of Appeals, by its own rules, is not the proper forum for the creation of a reviewable record.

## II. IRREPARABLE HARM

 Seldom, if ever, has such a dramatic, heartrending and powerfully persuasive case of irreparable harm to literally tens of thousands of human beings been presented to this federal court.

### A. THE UNCONTRADICTED TESTIMONY

Maria Esperanza Vargas de Chavarria, a Nicaraguan wife and mother, entered the United States on November 11, 1988, with her husband and infant daughter. They applied for political asylum, and after three appearances before an Immigration Judge, the application for asylum was denied in 1994. Mrs. Chavarria filed an appeal from the decision. Her appeal has yet to be ruled upon. In 1995, Mrs. Chavarria, her husband and daughter applied for suspension of deportation. Mrs. Chavarria and her husband had a hearing on November 12, 1997, but their daughter has had no hearing. Mrs. Chavarria's request for suspension of deportation was denied, and she appealed this decision to the Board of Immigration.

Mrs. Chavarria's daughter, who is now seventeen years old, suffers from San Filippo's Down syndrome, and as a result of this illness, her bones "turn and twist and crumble up". (Tr. of June 11, 1997, at 132 11. 9–12.) Mrs. Chavarria stated that her daughter will eventually stop speaking, understanding, moving and walking. In addition, the child suffers from scoliosis of the back. She required extensive surgery because her back was "so twisted that it was affecting her lungs and pressing on them." (Tr. of June 11, 1997, at 132 11. 1–18.) Mrs. Chavarria's daughter's wounds from her back surgery became infected, affecting her bones as she remained hospitalized for two months.

Mrs. Chavarria testified that deportation of her daughter would be a "death sentence," because the necessary treatment is not available in Nicaragua. (Tr. of June 11, 1997, at 133–34.)

Dudley Rocha Petterson, a 27–year–old Nicaraguan husband and father of three, entered the United States on August 28, 1987, by way of Brownsville, Texas, at the age of 17. Mr. Petterson and various members of his family belonged to the Nicaraguan military and because of their background were victims of harassment, arrest and death. Mr. Petterson was arrested on two separate occasions before his escape from Nicaragua. (Tr. of June 11, 1997, at 146 11. 5–6.)

A few months after his arrival in the United States, Mr. Petterson applied for political asylum. When his application for asylum was rejected in 1992, he immediately appealed the decision of the Immigration Judge. After hearing media reports about possible suspension of deportation for Nicaraguans, he contacted Legal Aid. Mr. Petterson, upon the advice of his assigned attorney from Legal Aid, withdrew his pending application for political asylum and applied with his wife for suspension of deportation in consolidated applications. Mr. Petterson's application was denied and his wife's application was granted because "she never received an Order to Show Cause." (Tr. of June 11, 1997, at 154 11. 24–25.) Mr. Petterson stated his Immigration Judge advised him to "wait awhile, because there would certainly be changes in the law because the law was extremely unjust." (Tr. of June 11, 1997, at 155 11. 24–25, and at 156 1. 1.)

The Pettersons have three daughters who were all born in Miami, Florida and are U.S. citizens. Two of his young daughters (ages 7 and 6) suffer from Argininemia, a rare form of cerebral palsy. Only 40 cases of Argininemia have been documented in the world. Mr. Petterson explained that one of his daughters was born blind and the other daughter "just looked off into space . . . doesn't walk, . . . didn't talk, . . . didn't move." (Tr. of June 11, 1997, at 150 11. 22–25.) Mr. Petterson was informed by researchers at Jackson Memorial Hospital that the necessary treatment for Argininemia is not available anywhere in the world, except in the United States and Canada. (*Id.* at 151 1. 11.) The daughters' diets are closely monitored by a nutritionist and Jackson Hospital

because the children require special formulas available only at Jackson. Mr. Petterson's oldest daughter is fed through a tube. In addition, Mr. Petterson's daughters receive treatment from an orthopedic physician because neither of them can walk. The daughters must consult a neurologist. Mr. Petterson's daughters have improved considerably from the extensive treatment they have received from their doctors in the United States and also from the education and care they received at the United Cerebral Palsy School.

Mr. Petterson is unable to appeal his case because he does not have adequate finances. His daughters demand the complete attention of Mrs. Petterson, and Mr. Petterson is the sole financial provider. If Mr. Petterson is deported, Mrs. Petterson and her daughters will be homeless because neither Mrs. Petterson nor Mr. Petterson will be able to make the mortgage payments.

Alexandra Charles, a 19–year–old Haitian, entered the United States in September 1989 with a tourist visa after witnessing the beating and murder of her parents by the Haitian military as a 10–year–old child. Ms. Charles applied for political asylum but her request was denied because the Immigration Judge "didn't think it was enough evidence." (Tr. of May 13, 1997, at 133 1. 22). Ms. Charles appealed the decision to the Board of Immigration Appeals, but a decision has yet to be rendered. She applied for suspension of deportation and her request was granted. Immigration Services is now appealing this order. Based on the N–J–B interpretation of the new law and according to INS, Ms. Charles has only lived in the United States for six and a half years, falling short of the seven-year requirement for suspension of deportation. Although Ms. Charles has actually resided in the United States for eight years, INS takes the position that she is ineligible for suspension of deportation.

Ms. Charles attends Miami–Dade Community College and works as a reservationist at Club Limousine Service to pay for her tuition. She has a 3.3 GPA and hopes to attend the University of Florida upon her graduation from Miami–Dade. Ms. Charles' family lives in the United States.

Ms. Charles is a full-time student and cannot afford an appeal before the Eleventh Circuit Court of Appeals. She faces deportation to Haiti, where she witnessed the vicious murder of her parents and where she no longer has any ties. Not only will her education goals be shattered, her life may be at stake.

Lauren Correa is a 27–year–old housewife who entered the United States in 1988 and applied for asylum in Texas upon her arrival. Ms. Correa's application was denied, and she appeared before an Immigration Judge in 1991. The Judge's decision allowed Ms. Correa one year for a voluntary departure. After the year elapsed, Ms. Correa applied for multiple extensions of her voluntary departure. Ms. Correa received no response from INS although she continued to receive work permits until 1994. In 1996, Ms. Correa moved to reopen her case, seeking a suspension of deportation. Ms. Correa is scheduled to appear in July of this year regarding her application.

Ms. Correa is the mother of two American children, ages 7 and 3. Her 7–year–old, Marcos, is autistic and has been twice hospitalized for asthma. Marcos attends a school for exceptional children where he receives speech therapy three to four times weekly. If Marcos remains in a special school and continues his current therapy, he is likely to become a normally functioning adult. If he does not attend a special school and receive regular therapy, his progress will stop and he will never mature beyond his current mental capacity.

Ms. Correa's 3–year–old child, David, was born with a "tiny ball in his eye" that has been surgically excised. (Tr. of June 3, 1997, at 109.) A biopsy revealed nothing wrong; however David's neurologist suggests that David continue to be closely monitored through periodic M.R.I.s. David has demonstrated early signs of autism and is being monitored for this condition. Both of Ms. Correa's American children require frequent medical monitoring and regular therapy to continue their progress.

Lorena Mesa, a 32–year–old Nicaraguan, entered the United States in 1989 by cross-

ing through the Texas border. Ms. Mesa immediately applied for political asylum in Miami upon her arrival. Although Ms. Mesa was never given an appointment for an interview with INS, she continued to receive work permits. Ms. Mesa has yet to receive a final decision from the Immigration Judge regarding her application. Ms. Mesa is married to a Nicaraguan man whose initial asylum case was denied and is currently being appealed.

Ms. Mesa has been in the United States for more than seven years, and during that time has given birth to a daughter. Ms. Mesa's daughter is currently 3 years old and has been diagnosed with Down's syndrome, recurring heart murmurs, a kidney abnormality, and a cleft palate. She has had surgery to treat her heart condition and is likely to require a second surgical procedure to fully correct her heart condition. She also will likely need surgery to correct her cleft palate. She receives physical therapy, occupational therapy and language therapy almost monthly.

If Ms. Mesa is deported, her daughter will also have to leave the country to be with her parents and will likely die without the technology and health care the United States has available to aid her treatment.

Khadijeh Aidinezhad is an Iranian who entered the United States in July 1985, on a visitor visa. Ms. Aidinezhad's visa was extended, and eventually she received a student visa to complete her master's degree in the United States. After losing her student visa, Ms. Aidinezhad contacted an attorney who advised her that she might be eligible for political asylum. At her asylum hearing, Ms. Aidinezhad was denied asylum, and she appealed. The "Court of Appeals" returned Ms. Aidinezhad's case to the Immigration Judge, stating that there was no evidence to support the denial of Ms. Aidinezhad's application and that the case should be reopened. Ms. Aidinezhad was then informed by the "Court of Appeals" that she was eligible for suspension of deportation.

Before the Immigration Judge reviewed Ms. Aidenezhad's application for asylum, Ms. Aidenezhad withdrew her application for asylum and applied for and was granted suspension of deportation. The attorney for INS agreed that Ms. Aidinezhad would suffer extreme hardship if deported to Iran and that Ms. Aidinezhad was a person of good moral character. INS appealed Ms. Aidinezhad's grant of suspension, contending that the law had changed and was no longer applicable to her case. This appeal is still pending.

Ms. Aidinezhad is the sole care-giver and financial provider to her 79–year–old mother, a U.S. resident, who suffers from severe osteoporosis and thyroid problems. Ms. Aidinezhad's mother requires constant medical attention and care and relies entirely on Ms. Aidinezhad to provide her with basic necessities and medicine. Although currently employed as a stenographer ultrasound specialist, Ms. Aidinezhad hoped to continue her education in the United States and complete her master's degree, an option not available to women in Iran.

If Ms. Aidinezhad is deported, she will lose the chance to continue her education, and more importantly, her elderly and dependent mother will lose the only financial support and care giver she has.

Olga Isabel Martos Rodriguez del Cazo arrived in the United States in 1988 with her husband and two children, then ages 7 and 1. Since arriving, Ms. Cazo has had an American child, now age 7. Ms. Cazo has three brothers who were granted asylum, and eventually became U.S. citizens. Ms. Cazo filed an application for asylum upon her arrival, and was denied the following month. Ms. Cazo reapplied in February 1989. While awaiting her hearing with the judge, Ms. Cazo learned of the seven-year rule. After contacting her attorney, and believing her chances of success in a suspension of deportation hearing to be favorable, Ms. Cazo withdrew her application for asylum. At Ms. Cazo's suspension hearing, she was denied suspension of deportation and is currently appealing.

Carla Patricia Centeno, an 18–year–old mother, came to the United States from Nicaragua in August 1989 with her 6–month–old son, aunt, and three cousins. They fled their native land because of political persecution and crossed into the United States by way of Texas.

Four days after Ms. Centeno's arrival in the United States, she presented herself to the INS in Texas and applied for asylum. Due to financial restraints Ms. Centeno could not travel from Miami to Texas to appear at her asylum hearing, and her case was closed in her absence. (Tr. of June 3, 1997, at 119 1. 14.) Ms. Centeno filed a second request for asylum with the INS in Miami, but she has yet to be notified of the status of her asylum request.

Finally, Ms. Centeno applied for suspension of deportation in September 1996 after being in the United States for seven years. Ms. Centeno testified that she learned about suspension of deportation relief from the print and television news media. (Tr. of June 3, 1997, at 120, 1 12.) She believed that she would receive a suspension of deportation if she fulfilled the requirements of the law. However, her belief was groundless because her request for suspension was denied. Ms. Centeno has appealed this decision to the Immigration Board of Appeals and is still awaiting a decision.

Four months after Ms. Centeno arrived in the United States her son was diagnosed with cerebral palsy. Her son, who is now 8 years old, is confined to a wheelchair because he is unable to walk. His disease requires that he receive medical supervision by a neurologist, physical therapist, and an occupational therapist. Ms. Centeno's son also applied for a suspension of deportation and his request was denied. This denial ensures that the hardships of this family will grow because the special classes and medical treatment that her son needs are not available in Nicaragua. (Tr. of June 3, 1997, at 124, 1. 11.)

Although Ms. Centeno has appealed this decision, her attorney has advised her that her appeal will be denied and that she will have to appeal to a higher court. (Tr. of June 3, 1997, at 123, 11. 23–24.) The appeal to a higher court is out of Ms. Centeno's reach because she will not be able to afford counsel to represent her. (Tr. of June 3, 1997, at 124, 11 4–5.)

Juan Raphael Baez, an 18–year–old Nicaraguan, entered the United States with his oldest brothers and his younger sister by crossing the Mexican border in September 1986 at the age of 7. Mr. Baez and his family applied for and were granted suspension of deportation on October 28, 1996. INS has appealed this decision.

Mr. Baez will graduate in June 1997 from Miami Coral Park Senior High, where he actively participated in student government and various extracurricular activities. Mr. Baez, if allowed to stay in the United States, plans to enroll at a local community college and major in video production and advertising. Mr. Baez aspires to attend the University of Miami and to enroll in the cinematography program, one of best programs in the country. Mr. Baez explains that he has spent his formative years in the United States, and it has become his society and his culture. (Tr. of May 13, 1997, at 199 1. 20.)

Mr. Baez does not have the funds to pursue an appeal in the Court of Appeals. If deported, Mr. Baez will have to drop out of school and leave his home, his culture and his country.

Yade Lacayo, a 20–year–old Nicaraguan, entered the United States with a tourist visa on February 5, 1987, at the age of 10. Mr. Lacayo has lived in the United States for the last ten years and has received a final order of deportation. His parents and siblings received residency, and one brother became a citizen of the United States. He has applied for suspension of deportation but his request was denied based on the Defendants' *N–J–B* interpretation. Mr. Lacayo, for immigration purposes, has been in the United States for only three years (not ten years). He received a final order of deportation on April 21, 1997.

Mr. Lacayo has attended school in the United States since the fifth grade and is presently a junior at Florida International University, where he maintains a 3.0 GPA. He expects to graduate in December 1998, in Mathematics Education. He works as a substitute teacher at Miami Senior High School to pay for his education, plans to acquire a master's degree in leadership and aspires to be a school principal. In addition to his curricular activities and his employment, he is an active member of the community. He

belongs to the Holy Ghost Church, "attend[s] Camillus House, organize[s] food drives, walk-a-thons." (Tr. of May 13, 1997, at 145 11. 4–6.)

Mr. Lacayo is unable to appeal the immigration decision because he does not have the necessary funds. If deported Mr. Lacayo will lose his family, his home for the last ten years, and his community.

Lucille Barrow Hodgson, an 86–year–old Nicaraguan widow, mother of six and grandmother of twelve, entered the United States on April 29, 1984, with a tourist visa. Mrs. Hodgson has resided in the United States for the last thirteen years. In 1987, Mrs. Hodgson applied for political asylum but was denied. She applied for suspension of deportation with the help of Florida Immigrant Advocacy Center, but that request was denied. Mrs. Hodgson appealed this decision, but her request for an appeal to the Board of Immigration was denied.

Mrs. Hodgson, who lives with her oldest daughter, suffers from high blood pressure and bronchitis. Mrs. Hodgson's children, most of whom live in the United States, presently take care of her.

If Mrs. Hodgson is deported, she will have no one to take care of her, and she be not be able to care for herself financially. Mrs. Hodgson has no other means of support but her children who reside in the United States.

Frank Lopez, a 16–year–old, came from Nicaragua with his mother and brother in 1988. Mr. Lopez's mother filed applications for political asylum for herself and her two sons but later withdrew them so that she could join their case with her husband's deportation proceedings. (Tr. of June 3, 1997 at 131 11. 14–15.) Mr. Lopez testified that he is very emotionally distressed over the possibility that his father's application of suspension of deportation will be denied. Mr. Lopez's father, who had not been in the United States seven years when he filed his application, will not be eligible for suspension under the terms of § 309(c)(5) of the Illegal Immigration Reform and Responsibility Act of 1996. (Tr. of June 3, 1997, at 132 11. 17, 19 and 22.)

Mr. Lopez also testified that his father is the main financial support of his family, and if his father is forced to return to Nicaragua, his mother cannot support the family alone. (Tr. of June 3, 1997, at 132, 11. 23 and at 133, 11. 6–7.) He testified that his 17–year–old brother, who is classified as learning disabled because he cannot read or write, will not be able to get any help for his learning disability in Nicaragua. (Tr. of June 3, 1997, at 133, 11. 17, 20, 22 and 23.) lt is Mr. Lopez's belief that his brother will suffer extraordinarily from his father's leaving because his father gives his brother needed extra support and attention. (Tr. of June 3, 1997, at 134 11. 7–9.)

Mr. Lopez testified that he has no future in Nicaragua, (Tr. of June 3, 1997, at 134 1. 16), because he has not been back to Nicaragua since he was 6 years old. He testified he would not return to Nicaragua with his father if his father were deported. (Tr. of June 3, 1997, at 134, 11. 14, 20–21 and at 35, 1. 5.) As Mr. Lopez so poignantly put it: "I have everything here. I have a future here." (Tr. of June 3, 1997, at 134, 1. 16.)

The preceding twelve summaries of individual cases of persons who testified in this preliminary injunctive hearing are a cross-section of the Plaintiff class. There are thousands of other cases that could be developed at the ultimate trial in this case.

This testimony, as indicated above, is unrebutted. The Defendants have elected to forgo the presentation of any evidence disputing any of the testimony set forth herein. They have, as observed in the preceding opinion, elected to rely upon the policies established by INS for retroactivity of the calculus by which presence in the United States is computed and upon lack of jurisdiction in the United States District Court.

As Defendants have so correctly stated at page 44 of their brief "A showing of irreparable injury is the sine qua non of injunctive relief." *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors of America v. City of Jacksonville,* 896 F.2d 1283, 1285 (11th Cir.1990). Plaintiffs agree, citing *Canal Authority v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974).

The Defendants have respectfully, but forcefully, made it clear that they will continue to deport class members. This was confirmed by the testimony of Congressman Peter Deutsch that he had received requests for assistance from many people who had received their "bag and baggage" letters. (Tr. of May 13, 1997, at 17.)

According to Plaintiffs' Exhibits 33, 41 and 42, and the testimony of Mr. Lux, Ms. Little, Mr. Turtletaub, Mr. Lovo, Mr. Lacayo, (Tr. of May 13, 1997, at 145.) A substantial number of Plaintiffs have had their suspension hearings denied, appeals dismissed or motions to reopen denied based on the Defendants' policies and interpretation of IIRIRA and *N–J–B*. Mr. Turtletaub testified, (May 13, 1997, at 58) that he had a client who did not want to send his child to school because of the situation.

Fear and panic have swept through the community, causing families to move from their homes, refuse to send children to school or the doctor, or bring their children to the hospital for medical attention. (Trs. of June 11, 1997, at 72 and 81; June 3, 1997, at 37–38; May 13, 1997, 171 and 183.)

The Director of the Human and Labor Rights Institute at Florida International University, Haydee Marin, testified that one family refused to bring their child to a hospital for medical attention, fearing deportation. The child died.

"The purpose of a preliminary injunction is to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *United States v. State of Alabama*, 791 F.2d 1450, 1459 (11th Cir.1986). The Court finds that the Plaintiff class has established that class members will sustain substantial irreparable harm if a preliminary injunction is not issued. Accordingly, the Court orders a preliminary injunction to preserve the Court's jurisdiction until orderly and meaningful discovery can be completed and a trial held.

### III. BALANCING HARM OF PLAINTIFFS TO HARM OF DEFENDANTS

██ The Court considers first the Defendants' position, as set forth at pages 55–57 of their memorandum, as to harm flowing to the federal government if a preliminary injunction is entered. The Defendants assert that "... the granting of a preliminary injunction would interfere with the federal government's ability to control the flow of immigration and ... the ability of the Executive Office of Immigration Review to effectively process the cases within its jurisdiction." (Defs.' Mem. at 56.)

The Plaintiff class argues that this is an imagined harm because Plaintiffs do not seek "... an injunction of deportation *proceedings* or even a particular outcome in any deportation case. Defendants are free to move forward with deportation proceedings as quickly as they wish. If Defendants claim that giving someone a suspension of deportation hearing interferes with their processing of cases, then they ignore their statutory responsibility to permit hearings where they are provided by law. Plaintiffs seek deportation hearings under proper standards." (Pls.' Mem. at 57.)

Upon balance, the administrative inconvenience the Defendants may sustain does not outweigh the serous and substantial irreparable harm to thousands of class plaintiffs as set forth in the preceding portions of this opinion.

### IV. DOES ENTRY OF A PRELIMINARY INJUNCTION SERVE THE PUBLIC INTEREST?

██ The uncontradicted testimony of Assistant County Manager Jose Antonio Ojeda that there would be approximately a $1 billion loss in revenue to Dade County if Nicaraguan class members were deported, (Tr. of June 11, 1997, at 108), would seem to resolve this issue. He went on to testify that the deportation of class members would affect the County's efforts in regard to new welfare legislation that requires welfare recipients to find work. A major source of employment for such people is in small businesses such as those operated in the Nicaraguan community in Dade County. The departure of such businesses would affect those efforts.

State Representative Jorge Rodriguez Chomat, attorney and state representative

for District 114 of the State of Florida, testified that the Nicaraguan community of Sweetwater is becoming increasingly concerned and worried about the effect deportation will have on their community. The community, as it understands the law, fears that families will be separated and that the entire community will be uprooted. Rep. Chomat explained that parents were fearful they would be deported to Nicaragua and forced to abandon their minor children who are U.S. citizens. In addition, Rep. Chomat testified about the detrimental economic effect deportation would have on the community of Sweetwater. He stated that the "city would have to stop existing" if a substantial number of the Nicaraguan community was deported. According to Rep. Chomat, the community is experiencing feelings of panic.

An application of the law as presently interpreted in *N–J–B* would negatively affect Dade County, and particularly, the City of Sweetwater, economically as well as emotionally.

Robert Arguello, a U.S. citizen born in Managua, Nicaragua, is a prominent Nicaraguan in the Miami community. He has testified before Congress on two occasions regarding the needs of the Nicaraguan community, and he is a member of the United States Hispanic Task Force. Mr. Arguello testified that the recent ruling in *N–J–B* has had tremendous effect, both socially and economically, on Nicaraguans living in Miami. He described the situations of numerous Nicaraguans who have been unable to get work permits and have lost their jobs as a consequence. Also affected are American children of Nicaraguan parents. The children are afraid to go to school, fearing that their parents will be deported in their absence. He estimated that as a result of the government's changed policy, 100,000 Nicaraguans will lose their jobs and will no longer be able to afford the basic necessities of food, rent and utilities. (Tr. of June 3, 1997, at 27.)

Mario Lovo, a Nicaraguan attorney educated in the United States, testified that suspension of deportation is a form of relief that no longer exists for his Nicaraguan clients, since the ruling of *N–J–B*. (Tr. of

May 13, 1997, at 154.) Under the current process, if a Nicaraguan does not have a suspension of deportation hearing pending, he cannot renew his work authorization. Since 1995, if a Nicaraguan filed a motion to reopen and a suspension of deportation (and paid a $110 fee) he would be given work authorization. (*Id.* at 155.) Mr. Lovo testified he does not know of any other nationalities that received the same treatment, and that this was inducement for Nicaraguans to submit applications for suspension of deportation.

Mr. Lovo further testified that since the ruling in *N–J–B* many of his clients have been denied work authorization. (*Id.* at 156.) Mr. Lovo submitted documents (Exs. 8 and 9) signifying a denial of an application and work authorization based on *N–J–B*. Mr. Lovo testified that under the current circumstances, clients can be deported without having the ability to appeal to the Eleventh Circuit, as they do not have a final administrative ruling. (*Id.* at 160.)

### *CONCLUSION*

The Court finds, for the reasons set forth in the foregoing opinion, that the Plaintiff class members have demonstrated their entitlement to preliminary injunctive relief prayed for in their complaint by establishing: (1) that there is substantial likelihood of success on the merits, (2) that the preliminary injunction is necessary to prevent irreparable injury, (3) that the injury to the Plaintiff class outweighs any harm to the Defendants, and (4) that the preliminary injunction would serve the public interest. It is, therefore

ORDERED, ADJUDGED and DECREED that the Defendants, Janet Reno, Attorney General of the United States, Robert Wallis, District Director, Immigration and Naturalization Service, Department of Justice, and Board of Immigration Appeals, and their agents, employees, lawyers and persons acting under the direction and control, be and they are hereby, preliminarily enjoined from (1) deporting any member of the Plaintiff class, and (2) enforcing *Matter of N–J–B* or otherwise pretermitting applications for suspension of deportation based on

the Defendants' policy as expressed in said *Matter of N–J–B.*

It is further ORDERED, ADJUDGED and DECREED that the bond heretofore posted by the Plaintiff class upon the entry of the temporary restraining order on May 14, 1997, shall constitute the appropriate and proper bond to stand as security under Fed. R.Civ.P. 65(c) during the pendency of this preliminary injunction.

It is further ORDERED, ADJUDGED and DECREED that a trial in this case shall commence on January 5, 1998.

DONE AND ORDERED.