**POPULAR BANK OF FLORIDA, a Florida corporation, Plaintiff,**

v.

**BANCO POPULAR DE PUERTO RICO, and Banco Popular N.A. (Florida), Defendants.**

**No. 97–2751–CIV.**

United States District Court, S.D. Florida.

June 5, 1998.

---

Mitchell H. Stabbe, Erik Phelps, Dow, Lohnes & Albertson, P.L.L.C., Washington, DC, Leslie J. Lott, Lott & Friedland, P.A., Coral Gables, FL, for Plaintiff.

Hugo L. Black, Jr., Joseph W. Beasley, Kelly, Black, Black, Byrne & Beasley, P.A., Miami, FL, Alan S. Cooper, Eric T. Fingerhut, David J. Cho, Kelly C. Maynard, Shaw, Pittman, Potts & Trowbridge, Washington, DC, for Defendants.

### ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

GOLD, District Judge.

Popular Bank of Florida asks this Court to grant a preliminary injunction prohibiting Banco Popular de Puerto Rico and Banco Popular N.A. (Florida) from using the marks Banco Popular or Popular Express, in Dade, Broward, Monroe, and Palm Beach Counties.[1] The critical inquiry before the Court is whether Popular Bank of Florida has demonstrated a substantial likelihood of success on the merits by showing that its rights to the mark are prior and superior and that defendants' use of the mark Banco Popular or Popular Express is likely to cause consumer confusion.

### I. FACTS

Popular Bank of Florida is a full-service commercial bank which specializes in international correspondent banking, personal banking, and domestic mortgage lending. Over 100 people are currently employed in Popular Bank's two Miami offices. At the end of 1996, Popular Bank had assets of $310.1 million. Popular Bank has been providing financial and banking services under the name Popular Bank of Florida since 1979. Plaintiff

---

**1.** Specifically plaintiff asks that the defendants "be preliminarily enjoined and restrained from using the name or mark "Banco Popular" or using any other name or mark confusingly similar to Plaintiff Popular Bank's Popular Bank of Florida mark, including, but, not limited to Popular Express, in South Florida, namely, the area encompassing Dade, Broward, Palm Beach and Monroe counties, in connection with selling, offering or advertising any goods or services, whether or not offered from an office or any other facility that has a physical presence in South Florida."

registered its Popular Bank of Florida service mark with the Florida Secretary of State in 1990. In the six-year period prior to 1979, Popular Bank of Florida had been operating under the name and service mark Popular Bank of Hialeah.

Banco Popular de Puerto Rico is a full-service commercial bank headquartered in Puerto Rico. With over $15.08 billion in assets, Banco Popular de Puerto Rico is the largest bank in Puerto Rico, and clearly dwarfs Popular Bank of Florida in terms of size and assets. Banco Popular has been rendering banking and financial services in Puerto Rico since 1893. Banco Popular N.A., the owner of Banco Popular de Puerto Rico, is a national banking association, owned by Popular Corporation, a holding company under the laws of the territory of Puerto Rico. Currently, Banco Popular has a network of 56 banks located in Chicago, New York, Dallas, Los Angeles, and Orlando. Defendants registered the mark Banco Popular with the United States Patent and Trade Office (PTO) and a Certificate of Registration was issued in March, 1995.

In late 1996, Banco Popular initiated a marketing campaign to increase its recognition in the Hispanic community on the continental United States. In January, 1997, it hired as its spokesperson, Don Mario Kreutzberger, well-known in the Hispanic community as Don Francisco, host of the popular Spanish-language variety program entitled "Sabado Gigante." Four television commercials were created for Banco Popular to be shown on "Sabado Gigante" in cities with substantial Hispanic television audiences including Miami. A goal of the television advertising campaign was to promote the Banco Popular name and mark in Florida.

In May 1997, Banco Popular acquired Seminole National Bank, which has its principal place of business in Sanford, Florida and operates three branches in Sanford and Orlando, Florida. Defendants changed the name of Seminole National Bank to "Banco Popular." In October, 1997, Banco Popular acquired twelve established check-cashing facilities in Miami. Applications for approval to operate the outlets were submitted to the Federal Reserve Bank and the Department of Banking and Finance of the State of Florida. Banco Popular plans to operate these check-cashing facilities under the name "Popular Cash Express." Popular Bank argues that the customer confusion generated by Banco Popular's television commercials has been immense. In the months following the initial broadcast of the commercials, Popular Bank received thousands of phone calls from consumers seeking the banking services of Banco Popular De Puerto Rico.

The complaint seeks injunctive relief and damages under several causes of action including: (1) service mark infringement under section 43(a) of the Lanham Act, 15 U.S.C. section 1115(a); (2) unfair competition in violation of section 43(a) of the Lanham Act, 15 U.S.C. section 1125(a); (3) unlawful dilution of the plaintiff's service marks in violation of section 43(c) of the Lanham Act, 15 U.S.C. section 1125(c); and (4) service mark infringement and unfair competition under Florida common law. Plaintiff seeks to enjoin the defendants from using the name or mark "Banco Popular" or any other mark, such as Popular Express, in Broward, Dade, and Monroe counties. Popular Bank contends that it is entitled to an injunction to prevent "reverse" confusion. According to plaintiff, its reputation and good will is threatened because customers who have seen the television commercials contact Popular Bank in order to obtain the services advertised by Banco Popular and become disappointed and angry at Popular Bank when informed that those services are not available.

On May 1, 1998, the Court held a hearing on plaintiff's motion for preliminary injunction at which time the parties presented evidence concerning the issues of priority of use, the validity of the mark, and whether the defendants' trademark is the same or confusingly similar to the plaintiff's mark Popular Bank so as to confuse consumers about the origin of the goods or services.

## II. LEGAL STANDARD FOR PRELIMINARY INJUNCTION

A party seeking a preliminary injunction must demonstrate: (1) a substantial likelihood of success on the merits; (2) irreparable harm should the injunction not be

granted; (3) the threatened injury to the plaintiff outweighs any potential harm to the defendant; and (4) granting the injunction would not be adverse to the public interest. *Canal Authority v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974). *See also Warren Pub. Inc. v. Microdos Data Corp.,* 115 F.3d 1509 (11th Cir.1997); *Haitian Refugee Ctr., Inc. v. Nelson,* 872 F.2d 1555, 1561–62 (11th Cir. 1989). The issuance of a preliminary injunction is an extraordinary equitable remedy which should not be granted absent a clear showing that the moving party has met its burden of proof. *Cafe 207 v. St. Johns County,* 989 F.2d 1136, 1137 (11th Cir.1993). Preserving the court's ability to render a meaningful decision after a trial on the merits is the primary justification for granting a preliminary injunction. *Tefel v. Reno,* 972 F.Supp. 623, 633 (S.D.Fla.1997). Findings made on an application for preliminary injunction are not controlling at a later hearing on a permanent injunction. *E. Remy Martin & Co. v. Shaw–Ross Int'l Imports, Inc.,* 756 F.2d 1525, 1527 n. 1 (11th Cir.1985). With these basic principles in mind, the Court now turns to the merits of the preliminary injunction application in this case.

### LIKELIHOOD OF SUCCESS ON THE MERITS

 Under either the common law or statutory law, the principles of trademark infringement are the same. *Tally–Ho, Inc. v. Coast Community College Distr.,* 889 F.2d 1018, 1025–26 (11th Cir.1989). A defendant is liable for trademark infringement if, without the consent of a prior user or registrant, he uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark" which is likely to cause confusion. *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 972 (11th Cir.1983)(quoting 15 U.S.C. section 1114(1)(a)). To prevail in a trademark infringement action, the plaintiff must show three things: first, that it was the first to use the trademark in the same market; second, that its mark is valid; and third, that the defendant's use of the contested mark is likely to confuse consumers. *Dieter v. B & H Indus. of S.W. Fla., Inc.,* 880 F.2d 322, 326 (11th Cir.1989); *Burger King Corp. v. Mason,* 710 F.2d 1480, 1491 (11th Cir.1983). *See*

*also Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.,* 106 F.3d 355, 360 (11th Cir.1997); *Investacorp, Inc. v. Arabian Investment Banking Corp. (Investcorp) E.C.,* 931 F.2d 1519, 1521 (11th Cir.1991); *American Television and Communications Corporation v. American Communications and Television, Inc.,* 810 F.2d 1546, 1548 (11th Cir.1987); *Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1512 (11th Cir.1984).

### A. PRIORITY OF USE.

 The right to the exclusive use of a particular mark or name as a trademark is ordinarily founded on priority of appropriation. *Columbia Mill Co. v. Alcorn,* 150 U.S. 460, 463–64, 14 S.Ct. 151, 37 L.Ed. 1144 (1893). The first to use a mark on a product or service in a particular geographic market acquires rights in the mark in that market. *Tally–Ho, Inc.,* 889 F.2d at 1022–23. In this case, each party contends that it was first to use the mark. Priority of use therefore is a critical threshold issue which must be resolved before the issues of validity and likelihood of confusion are addressed. *See Lone Star Steakhouse & Saloon, Inc.,* 106 F.3d at 360.

Banco Popular alleges that it is a famous and well-known bank that has been operating in Puerto Rico under the trade name and service mark Banco Popular since 1893. It argues that it has superior trademark rights because it has been doing business in Florida for nearly thirty years, is well-known by those in the banking trade, and that South Florida is within its zone of natural expansion. Responding to Banco Popular's argument, Popular Bank contends that Banco Popular may be well-established in Puerto Rico, but it is a newcomer to the South Florida area.

In contrast, Popular Bank has been advertising and doing business under the mark Popular Bank of Florida continuously since September 29, 1979. In 1982, Popular Bank was purchased by its present owners from Popular Bancshares, Inc., a bank holding company. Popular Bancshares was a wholly-owned subsidiary of Inversiones Internacionales Dos, Ltd. According to plaintiff, Inversiones was in turn controlled by defendant

Banco Popular de Puerto Rico. In light of these facts, plaintiff argues that when it purchased Popular Bank from an entity closely related to the defendant in 1982, it purchased the mark Popular Bank, including the "goodwill" of the seller. Consequently, in 1982 Banco Popular withdrew from engaging in banking operations in the State of Florida until it entered the market in April, 1997 by purchasing the banks in Central Florida and by broadcasting its commercials to South Florida on the "Sabado Gigante" show.[2]

Resolution of the priority issue is governed by common law principles which recognize exclusive trademark rights based on actual use, business presence and reputation, and zone of natural expansion. *Tally–Ho, Inc.*, 889 F.2d at 1025–27. These controlling principles which determine the relative rights to use the same or confusingly similar marks in the same and different geographical areas originate from the Supreme Court's decisions in *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916), and *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918). In *Hanover Star Milling*, the Court drew a basic distinction between: (1) the concurrent use of the same or confusingly similar marks in the same market, and (2) the use of those marks in separate and remote geographic markets. Only where the marks are used in the same geographic market does the principle of prior appropriation and use control to vest the senior user with exclusive rights. *Hanover*, 240 U.S. at 416, 36 S.Ct. 357. *United Drug Co. v. Theodore Rectanus* extended *Hanover*, holding that a senior user enters the junior user's territory subject to whatever rights the junior has acquired. *United Drug Co.*, 248 U.S. at 100, 39 S.Ct. 48. The actual geographic area a party carves out is a question of fact, and a court delimits the area by examining the party's reputation, advertising, and sales in the territory at issue. *Thrifty Rent–A–Car Sys., Inc. v. Thrift Cars, Inc.*, 639 F.Supp. 750, 753 (D.Mass.1986)(citing 2 McCarthy, *Trademarks and Unfair Competition* section 26:12 at 309 (2d ed.1984)).

**1. Common Law Rights Based on Actual Use.** To establish prior use of a mark in a particular territory, a party must, at a minimum, prove a level of use in the ordinary course of business in that territory sufficient to acquire rights in the mark. *Restatement (Third) of Unfair Competition* section 19 comment b (1995). Insignificant or sporadic use cannot establish an owner's exclusive right to its mark. The Court finds that Banco Popular failed to make any significant penetration of the South Florida market until it started airing its commercials in early 1997.

Estela Martinez de Miranda, an Assistant Vice President at Banco Popular, testified that Banco Popular de Puerto Rico has provided banking services to more than 13,500 Florida residents over the past thirty-five years. A closer examination of the evidence, however, reveals that Banco Popular never had 13,500 deposit account holders in Florida, the number of account holders was considerably less than 13,500, perhaps closer to 800. The exact number was never established. Many of the persons listed as account holders merely held credit card accounts and a great number of those credit card accounts were purchased by Banco Popular from another bank. Banco Popular's mark was not even prominently displayed on the credit cards. The Court finds that credit card use of this type is qualitatively different from providing traditional banking services, and that the credit cards were insufficient to establish consumer recognition of the mark in connection with traditional banking services.

Sales are an important consideration in delimiting a trademark owner's territory. *Sweetarts v. Sunline, Inc.*, 380 F.2d 923, 929 (8th Cir.1967). The number and dollar amounts of the sales in the area, the number of customers, the pattern of sales over time, and the potential growth of sales are all relevant factors that should be considered by the court in determining actual use. *Id.; see also Restatement (Third) of Unfair Competition* section 19 comment. According to defendants' tax returns, during the years 1990

**2.** The facts and implications of the sale of Popular Bank by an entity closely related to the defen-

dants are discussed further in the section of this opinion which addresses the issue of bad faith.

through 1994, the defendants derived virtually no income from Florida.

**2. Common Law Rights Based on Reputation and Business Presence.** A party who has established a reputation in an area may acquire exclusive rights to its mark there, even though the product bearing its mark is not sold in the area. *Peaches Entertainment, Corp. v. Entertainment Repertoire Assoc.*, 62 F.3d 690 (5th Cir.1995); *Stork Restaurant v. Sahati*, 166 F.2d 348 (9th Cir. 1948); *Chase Fed. Sav. & Loan Ass'n. v. Chase Manhattan Fin. Servs.*, 681 F.Supp. 771 (S.D.Fla.1987). The extent to which advertising has carried the reputation of the mark into a new territory is a factor to be considered in deciding whether the territory has been successfully appropriated by the mark's owner. *Thrifty Rent–A–Car Sys., Inc.*, 639 F.Supp. at 753. If goods bearing the trademark are transported by purchasers to other areas, or if the business attracts customers from different locations, the trademark may become known in areas far removed from the user's immediate location. *Restatement (Third) of Unfair Competition* section 19 comment b (1995). Thus evidence relating to the nature and extent of advertising and other promotional activities, the geographic distribution of catalogs and flyers, the geographical origins of orders and customer inquiries, are relevant factors in determining the geographic scope of a mark. *Id.*

Defendants claim to have spent significant amounts of money in South Florida for advertising and promotion prior to their Spring 1997 television campaign, but they failed to present any evidence in support of this claim. The only activity Banco Popular participated in that could be construed as advertising was the mailing of promotional materials from the bank to then-existing account holders. In light of the small number of account holders prior to 1997, defendants' volume of advertising can only be characterized as minimal. The testimony at trial established that Banco Popular had no business presence in South Florida prior to April 1997. Seven construction loans to developers were the only business Banco Popular did in Florida.

Defendants' evidence in support of their "zone of reputation" claim is inadequate to show that they had achieved a reputation in South Florida which would entitle them to trademark protection. Most zone of reputation cases involve businesses that have engaged in nationwide advertising resulting in widespread consumer recognition. *E.g. Stork Restaurant v. Sahati*, 166 F.2d 348 (9th Cir.1948)(Stork Club mark was entitled to nationwide protection based on its extensive advertising, stories in magazines with nationwide distribution, and mention on nationwide radio broadcasts). No evidence of consumer recognition was shown here prior to 1997. On this evidence, the Court finds that Banco Popular did not establish trademark rights based on reputation and business presence.

**3. Common Law Rights based on Zone of Natural Expansion.** A trademark owner may also establish enforceable common-law rights based on its natural zone of expansion. *Tally–Ho, Inc. v. Coast Community College Dist.*, 889 F.2d 1018 (11th Cir. 1989); *Chase Fed. Sav. & Loan Assoc.*, 681 F.Supp. at 773. Under this doctrine, a prior user who can prove neither use nor current association with the mark in the disputed area can still prevail over a subsequent good-faith user by establishing that the area is within the zone of the prior user's probable or natural expansion. Under the common law, the senior user could not monopolize markets that neither his use nor reputation could reach, but the "zone of natural expansion" doctrine provides the senior user with some limited "breathing space" in which to expand beyond its current use. *Tally–Ho, Inc.*, 889 F.2d at 1027–28. Some authorities, however, have concluded that the policy justification for the doctrine of zone of natural expansion has been eroded by statutory mechanisms, such as section 7(c), 15 U.S.C. section 1057(c), which protect federally registered marks through the concept of constructive notice. See *e.g., Raxton Corp. v. Anania Assoc., Inc.* 635 F.2d 924 (1st Cir.1980); *Restatement (Third) of Unfair Competition* section 19 comment e. Others have stated that a close examination of the leading zone of expansion cases shows that in fact each or those decisions rested upon a finding of secondary meaning or bad faith, or both. *E.g., Tally–Ho, Inc.*, 889 F.2d at 1028; *beef & brew v. Beef & Brew, Inc.*, 389 F.Supp. 179, 185–86 (D.Or.1974). Even in cases recogniz-

ing the zone of natural expansion doctrine, the resulting zone of natural expansion has been "narrowly defin[ed]." *Tally–Ho,* 889 F.2d at 1028, quoting, McCarthy, section 26:8.

Geographical proximity is a significant factor in the zone of natural expansion doctrine. *Id.* In *Tally–Ho,* both parties were operating in Florida. Here there is a great geographical distance between Puerto Rico and Florida. Market penetration, another factor in determining the zone of natural expansion, has been shown to be *de minimus* in this case. *See Tally–Ho.* Evidence concerning a third factor, actual expansion history, shows that Banco Popular has slowly been expanding into areas in the United States that have substantial Hispanic populations. But this fact alone is insufficient to entitle Banco Popular to trademark rights in South Florida.

## B. VALIDITY OF THE MARK.

 To be entitled to trademark protection, a mark must be valid and distinctive. *Freedom Sav. & Loan Ass'n v. Way,* 757 F.2d 1176 (11th Cir.1985). A Court may not reach the question of likelihood of confusion until persuaded that the putative mark is sufficiently distinctive to warrant protection. *Blau Plumbing, Inc. v. S.O.S. Fix-it, Inc.,* 781 F.2d 604, 610 (7th Cir.1986). The strength and distinctiveness of the plaintiff's mark is a vital consideration in determining the scope of protection it should be accorded.[3] *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 973 (11th Cir.1983). Distinctive marks are fanciful, arbitrary, or suggestive, and are deserving of protection. Thus the next issue the Court must decide is whether the words "Popular", "Bank", or "of Florida" are in fact protectable.

In ascending order of strength, there are four categories of distinctiveness in classifying a mark: (1) generic, (2) descriptive, (3)suggestive, and (4) arbitrary or fanciful. *Home Savings of America v. Home Savings Ass'n.,* 219 U.S.P.Q. 157 (S.D.Tex.1982). A generic mark is one which suggests the basic nature of the service. *See, e.g., Investacorp, Inc.,* 931 F.2d at 1522–23(the term "Milk

Delivery" is an example of a generic service mark for a hypothetical milk delivery service). Because it has no distinctiveness, a generic mark is incapable of achieving trade name protection. *Id.* If the Court were to extend protection to a generic term, a competitor could not describe his goods and services as what they are. *Ice Cold Auto Air of Clearwater, Inc. v. Cold Air & Access., Inc.,* 828 F.Supp. 925, 931 (M.D.Fla.1993). For this reason, generic names are regarded by the law as free for all to use. McCarthy, *Trademarks and Unfair Competition* section 12.01[1].

A descriptive mark identifies a characteristic or quality of a product or service, such as its intended use, ingredients, dimensions, or desirable features. *See, e.g., Investacorp, Inc.,* 931 F.2d at 1522–23(Barn Milk is a descriptive term). Descriptive marks include marks that are simply descriptive, laudatorily descriptive, and geographically descriptive. *See Great Southern Bank v. First Southern Bank,* 625 So.2d 463, 468 (Fla.1993)(friendly, dependable, preferred, first, and great are examples of laudatory descriptive marks; southern is geographically descriptive). A term that is likely to be perceived by prospective purchasers as merely descriptive of the nature, qualities, or other characteristics of the product or service, or as a mere geographical description of the origins of the goods or services, or as the personal name of a person connected with the goods or services, is not inherently distinctive. *Restatement (Third) of Unfair Competition* section 14. A descriptive term is not automatically protectable, but it may achieve that status once it has acquired a secondary meaning. *Ice Cold Auto Air of Clearwater, Inc.,* 828 F.Supp. at 931.

A suggestive mark suggests some characteristic of the product or service to which it is applied, but requires the consumer to use his imagination to determine the nature or the product or service. *John H. Harland Co.,* 711 F.2d at 974. *See also Great Southern Bank,* 625 So.2d at 467(suggestive marks include Artype for cutout letters for artists,

---

**3.** The distinctiveness of the mark is also referred to as its strength. *Restatement (Third) of Unfair*

*Competition* section 21, comment i.

Coppertone for sun tan oil, Gobble Gobble for processed turkey meat, and Heartwise for low-fat foods). Because a suggestive mark is inherently distinctive, it can be protected without evidence that it has acquired secondary meaning. *Id.* An arbitrary or fanciful mark bears no relationship to the product or service with which it is associated. *See Great Southern Bank,* 625 So.2d at 467(for example Ivory Soap is not made of ivory, Old Crow whiskey is not distilled from old crows, and Royal baking powder is not used exclusively by royalty). A purely fanciful or arbitrary mark is generally considered strong and is given protection over a wide range of related products and variations of the mark). *Id.* (quoting 1 J.T. McCarthy, *Trademarks & Unfair Competition* section 11:24, at 398 (1973). A composite mark is tested by looking at it as a whole, rather than by separate parts. *Great Southern Bank,* 625 So.2d at 469.

■ Applying the tests suggested above, the Court finds that the trademark Popular Bank of Florida consists of the laudatory word "Popular" joined with the commercially descriptive word "Bank" and the geographically descriptive term "of Florida." Thus, taken as a whole, "Popular Bank of Florida" is a descriptive mark. It is entitled to protection only if the plaintiff shows that the mark has acquired secondary meaning. *See Great Southern Bank v. First Southern Bank,* 625 So.2d 463 (Fla.1993)(name "First Southern Bank" is merely descriptive and not entitled to protection without proof of secondary meaning)[4]; *Home Sav. of Am. v. Home Sav. Ass'n,* 219 U.S.P.Q. 157, 159 (S.D.Tex.1982)(descriptive terms "Home" and "Home Savings" entitled to protection where plaintiff presented evidence of secondary meaning).

■ Secondary meaning is the connection in the consumer's mind between the mark and the provider of the product or service. *Ice Cold Auto Air of Clearwater, Inc.,* 828 F.Supp. at 931( citing *Investacorp, Inc.,* 931 F.2d at 1525). To prove secondary meaning, the plaintiff must demonstrate that "the primary significance of the term in the minds of the consuming public is not the

product but the producer." *Vision Ctr. v. Opticks, Inc.,* 596 F.2d 111, 118 (5th Cir. 1979). A high degree of proof is necessary to establish secondary meaning for a descriptive term which suggests the basic nature of the product or service. *American Telev. & Communic. Corp. v. American Communic. & Telev., Inc.,* 810 F.2d 1546, 1549 (11th Cir. 1987). Secondary meaning exists if a substantial number of existing or prospective customers understand the designation when used in connection with a business to refer to a particular person or enterprise. *Perini Corporation v. Perini Constr., Inc.,* 915 F.2d 121, 125 (4th Cir.1990); *Food Fair Stores, Inc. v. Lakeland Grocery Corp.,* 301 F.2d 156, 160–61 (4th Cir.1962). If a trade name has not acquired secondary meaning, the purchaser will not make an association with a particular producer and thus will not be misled by an identical or similar mark. *Thompson Medical Co., Inc. v. Pfizer, Inc.,* 753 F.2d 208, 216 (2d Cir.1985).

■ A plaintiff may prove secondary meaning by a variety of methods. The following factors are relevant to a secondary meaning inquiry: (1) the length and manner of use; (2) the nature and extent of advertising and promotion; (3) the efforts made by plaintiff to promote a conscious connection with the public's mind between the name and plaintiff's product; and (4) the extent to which the public actually identifies the name with plaintiff's product. *Coach House Restaurant, Inc.,* 934 F.2d at 1560; *Investacorp., Inc.,* 931 F.2d at 1525 (citing *Conagra v. Singleton,* 743 F.2d 1508, 1513 (11th Cir.1984)). Although secondary meaning may be proved by customer survey evidence, a survey is not required. *See Aloe Creme Labs., Inc., v. Milsan, Inc.,* 423 F.2d 845, 849 (5th Cir. 1970); *Home Savings of America,* 219 U.S.P.Q. at 159.

■ The evidence in this case shows that the plaintiff has provided financial and banking services in the area at issue—South Florida—under the mark Popular Bank of Florida since 1979. Under the Lanham Act, five years of continuous use gives rise to a presumption of secondary meaning. 15 U.S.C.

---

4. The Supreme Court of Florida analyzed *Great Southern Bank v. First Southern Bank* based on federal cases because section 495.181, Florida Statutes, is patterned on the Lanham Act.

§ 1052(f); *Stuart Hall Co., Inc. v. Ampad Corp.*, 51 F.3d 780, 789–90 (8th Cir.1995). During that time, plaintiff has expended substantial sums to promote its mark. Since 1988, plaintiff has spent approximately $2.9 million dollars on advertising and other promotional activities. It has increased customer awareness through the signs on its buildings, newspaper articles, and the bank's web site. To promote the conscious connection between its mark and its services, Popular Bank also includes its name on correspondence with customers and potential customers, on monthly statements, payment books, and the like. Such circumstantial evidence is sufficient to support a finding that the trademark has acquired secondary meaning. *See Home Savings of America*, 219 U.S.P.Q. at 159. Furthermore, the actual confusion created by defendants' advertisements constitutes direct evidence of secondary meaning. When defendants began their advertising campaign in South Florida, consumers began calling Popular Bank for the advertised services. As McCarthy states in his treatise, "if buyers are confused, then this also means that they must have recognized plaintiff's word as a trademark and associated it only with plaintiff." 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 15:11 (4th ed.1996); *see also Investacorp*, 931 F.2d at 1526 ("instances of consumer confusion are probative of secondary meaning"); *Adray v. Adry–Mart, Inc.*, 76 F.3d 984, 987 (9th Cir.1995) ( the law "clearly establishes that actual confusion is an indicium of secondary meaning").

Plaintiff also presented expert testimony. Charles Roedema, an advertising and marketing specialist, who reviewed the advertising, promotion, signage, and other expenditures. Based on his review of those materials, and his extensive knowledge and experience in the field, he concluded that plaintiff has achieved a "reasonable level of brand name awareness or identity among residents of South Florida, especially among the Hispanic community." He opined that Popular Bank enjoys a positive reputation and has "over the years . . . capitalized on its name, reputation and services to the South Florida community."

In light of plaintiff's uninterrupted and exclusive use of the mark for a substantial length of time, its promotion and advertising, the consumer confusion associated with the infringing use, and the testimony of plaintiff's expert, the Court finds that plaintiff has met its burden of proof to show that the mark Popular Bank of Florida has acquired secondary meaning in South Florida and is deserving of protection. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) ("[a]n identifying mark is distinctive and capable of being protected if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning.").

## C. LIKELIHOOD OF CONFUSION.

The ultimate question, for purposes of determining liability in trademark infringement actions, is whether there is a likelihood that consumers will be confused about the relationship or affiliation between plaintiff's products or services and the defendant's products or services. *Freedom Savs. & Loan*, 757 F.2d at 1179; *Caruso & Co. v. Estefan Enters., Inc.*, 994 F.Supp. 1454 (S.D.Fla.1998). Likelihood of confusion means probable confusion rather than mere possible confusion. *Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352, 1356 n. 2 (11th Cir.1983). The Eleventh Circuit has generally considered the following factors in assessing likelihood of confusion: (1) the strength of the plaintiff's mark; (2) the similarity of the design; (3) the similarity of the service; (4) the similarity of service outlets and customers; (5) the similarity of advertising media used; (6) the defendant's intent; and (7) any actual confusion. *Coach House Restaurant, Inc. v. Coach and Six Restaurants, Inc.*, 934 F.2d 1551, 1561 (11th Cir.1991); *Dieter v. B & H Indus.*, 880 F.2d 322, 326 (11th Cir.1989). In applying this test, no single factor is dispositive, but in the 11th Circuit, greater weight is given to the type of mark and evidence of actual confusion. *Dieter*, 880 F.2d at 326; *Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1186 (11th Cir.1985).

**1. Strength of Plaintiff's Mark.** The strength or distinctiveness of the mark was addressed earlier in this order in the section discussing the validity of the mark. As it

relates to the confusion issue, the 11th Circuit has written that "a very distinct mark which holds a formidable place in the consumer psyche is more susceptible to confusion from similar marks." *Coach House Restaurant, Inc. v. Coach and Six Restaurants, Inc.*, 934 F.2d 1551, 1561 (11th Cir.1991). Consequently, the law accords the greatest protection to strong and distinctive marks. *Freedom Sav. & Loan Ass'n*, 757 F.2d at 1182. Distinctiveness depends on the extent of third-party usage and the relationship between the name and the service it describes. *Id.* A name used by third parties other than the infringer is deserving of less protection. *Sun Banks of Fla. v. Sun Federal Savs. & Loan Ass'n*, 651 F.2d 311, 316 (5th Cir.1981). A word that is in common usage is a weak mark. *Id.* The rationale underlying this principle is that courts should not grant the holder of a mark that consists of a common English word a monopoly on that term. *Caruso & Co.*, 994 F.Supp. at 1458.

"Popular" is a common English word used extensively by third parties. According to the parties, there are twenty-six businesses in the Miami area which use the term "popular." None, however, are engaged in banking. The mark "popular" is therefore of weak trademark significance. In the absence of actual confusion, the name could probably be used without infringement, particularly in different marketing territories. *See El Chico, Inc. v. El Chico Cafe*, 214 F.2d 721, 725 (5th Cir.1954). Here, however, the competing marks are being used in the same territory, for identical services, with advertising directed at the same customers.

**2. Similarity of the Marks.** In determining whether the parties' marks are similar, the Court must compare the marks' appearances, sounds, meanings, and the manner in which the marks are used. *Amstar v. Domino's Pizza, Inc.*, 615 F.2d 252, 260 (5th Cir. 1980). Where, as here, the allegedly infringing trademark is a foreign word, the courts generally apply "the doctrine of foreign equivalents." Under the doctrine of foreign equivalents, if a foreign phrase translated into English is exactly the same as the existing English trademark, the marks are considered to be confusingly similar. *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1531 (4th Cir.1984); *Horn's Inc. v. Sanofi Beaute,*

*Inc.*, 963 F.Supp. 318, 323 (S.D.N.Y.1997). Some courts have held that foreign words or terms may not be registered if the English language equivalent has been previously used on or registered for products which may reasonably be assumed to come from the same source. *E.g., Ex Parte Odol-Werke Wien Gesellschaft M.B.H.*, 111 U.S.P.Q. 286, 1956 WL 7096 (1956). Other courts and authorities have applied a three-prong test: the "sound, sight and meaning trilogy of analysis." *See, Sanofi Beaute, Inc.*, 963 F.Supp. at 322 (quoting 3 J. Thomas McCarthy, *Trademarks and Unfair Competition* section 23.36 at 23–84 (4th ed.1996)).

Applying these principles, the marks in this case clearly have similarity of sound, sight, and meaning. It is undisputed that the English translation of "banco popular" is "popular bank." Thus the marks have the same meaning. But the similarity does not end there. The marks are also similar in sight and sound. "Popular" is the same word in sight and sound in Spanish as in English. The English word "bank" is a cognate of the Spanish word "banco." Banco Popular is therefore the foreign equivalent of Popular Bank. Given the large number of people fluent in Spanish in the South Florida area, the Spanish translation is likely to be recognized as the equivalent by South Florida consumers. As such, there is a high likelihood that banking customers will be confused by the defendants' service mark.

**3. Similarity of Goods and Services.** For purposes of plaintiff's motion for preliminary injunction, Banco Popular does not contest the substantial similarity of the banking and related financial services rendered by the parties.

**4. Similarity of Retail Outlets and Customers.** Dissimilarities between the retail outlets for the parties services reduce the possibility of confusion. *Freedom Savs. & Loan Ass'n*, 757 F.2d at 1184. It is undisputed that the parties' modern bank buildings are substantially similar. Furthermore, there is no dispute that the parties render banking services to the same type of consumers. Both banks primarily serve, and advertise to, members of the Hispanic community. Thus the similarity of retail outlets and cus-

tomers contributes to the likelihood of confusion.

**5. Similarity of Advertising Media.** The greater the similarity of the parties' advertising campaigns, the greater the likelihood of confusion. *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966 (11th Cir.1983). Popular Bank contends that the advertising media used by the parties are substantially similar. Banco Popular spends a great deal of money on national advertising. In contrast, Popular Bank advertises only locally and its advertising is generally limited to print media. Although Banco Popular uses print media for some advertising, its most powerful source of advertising is through national television ads. The Court finds that although there is some overlap, the parties' media advertising are substantially different.

 **6. Evidence of Actual Confusion.** One of the most important factors in determining whether a defendant's use of his mark is likely to cause consumer confusion is whether there has been actual confusion, that is, reported instances of individuals who have actually become confused about the source of the services because of the similarities between the parties' trademarks. Such instances of confusion include consumer inquiries regarding possible affiliation between the parties or attempts to purchase goods or services actually offered by the other party. Confusion can also be shown by misdirected correspondence such as bills or letters. According to the 11th Circuit, evidence of actual confusion is not required to support a finding that a likelihood of confusion exists, but actual confusion is the best evidence of likelihood of confusion. *E. Remy Martin & Co. v. Shaw–Ross Inter'l Imports, Inc.,* 756 F.2d 1525, 1529 (11th Cir.1985). No absolute measure exists as to how many instances of actual confusion are sufficient to establish this factor. Rather the court must evaluate the evidence of actual confusion in light of the totality of the circumstances involved. *AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, at 1543 (11th Cir.1986). Popular Bank presented evidence of misdirected mail and phone calls in order to show actual confusion.

**a. Misdirected telephone calls.** Maria Blanco, the former switchboard operator for Popular Bank, testified at the hearing that during the five and a half month period following the first Banco Popular television commercial on "Sabado Gigante," that she received nearly three thousand telephone calls inquiring about Banco Popular de Puerto Rico. More than half of those callers asked for information on how to obtain a Banco Popular credit card. Ms. Blanco submitted into evidence a tally sheet on which she would make a mark each time she received a call for Banco Popular de Puerto Rico. Defendants object to Ms. Blanco's testimony on two grounds: first they argue that her testimony is inadmissible because it is hearsay, and second, that the testimony has no probative value.

 Courts are divided on whether actual confusion evidence, in the form of testimony by the recipient of the statements of confused consumers, constitutes inadmissible hearsay evidence. Some courts have held that such testimony is hearsay which falls under no exception. *Programmed Tax Sys., Inc. v. Raytheon Co.,* 439 F.Supp. 1128, 1131 n. 1 (S.D.N.Y.1977)(declarants may describe own state of mind regarding confusion, but cannot attest to out-of-court declarant's state of mind) Other courts have admitted the evidence without consideration of the hearsay problem). *E.g., University of Ga. Athletic Ass'n v. Laite,* 756 F.2d 1535, 1546 (11th Cir.1985)(professor's testimony that he received approximately 10 to 15 inquiries in person or by phone from concerned fans was evidence of actual confusion); *Scandia Down Corp. v. Euroquilt, Inc.,* 772 F.2d 1423, 1430 (7th Cir.1985)(Scandia's employees testified to more than 180 incidents of customer confusion). Several courts addressing the issue have concluded that the employee's testimony is not hearsay because it is not offered to prove the truth of the matter asserted. *See, Int'l Kennel Club,* 846 F.2d at 1090(plaintiff's public relations official testified that she received calls on an almost daily basis from people who expressed confusion about plaintiff's relationship to the defendant); *Israel Travel Advisory Serv. Inc., v. Israel Identity Tours,* 1994 WL 30984 (N.D.Ill.1994)(holding that evidence of customer's question is admissible in Lanham Act cases to show actual confusion); *Mile High Upholstery Fabric Co. v. General Tire & Rubber Co.,* 221 U.S.P .Q. 217, 223 (N.D.Ill.1983); *Armco, Inc., v. Arm-*

co Burglar Alarm Co., 693 F.2d 1155, 1160 n. 10 (5th Cir.1982)(testimony about phone calls and conversations was not offered to show that Armco and Armco Burglar Alarm were the same business, but to show that people thought they were). Some courts have concluded that a statement by a customer offered to establish confusion in a trademark litigation is offered to prove the truth of the belief of the declarant and is therefore properly classified as hearsay but that the statement is admissible because it falls within Fed.R.Evid. 803(3), the state of mind exception. Ocean Bio–Chem, Inc. v. Turner Network Television, 741 F.Supp. 1546 (S.D.Fla.1990)(citing 4 J. Weinstein, M. Berger, D.Epstein, Weinstein's Evidence (1988 and Supp.1990); Source Serv. Corp. v. Source Telecomputing Corp., 635 F.Supp. 600, 612 (N.D.Ill.1986)(employee's affidavit regarding instances of customer confusion admissible under state of mind exception to hearsay rule); Freddie Fuddruckers, Inc. v. Ridgeline, Inc., 589 F.Supp. 72, 76 (N.D.Tex.1984)(hearsay letters and statements of customers are admissible in evidence under Fed.R.Evid. 803(3) where they reveal the then existing state of mind of the writers or speakers). In accordance with the greater weight of authorities, the Court finds that Blanco's testimony that she received over 3,000 phone calls by confused customers is admissible because it falls within the state of mind exception of Fed.R.Evid. 803(3).[5]

▮▮▮▮ Defendants' next argument is that Blanco's testimony should be disregarded as having no probative value. This argument is not persuasive. Courts have consistently held that evidence of misdirected telephone calls is probative of actual consumer confusion. E.g., International Kennel Club of Chicago v. Mighty Star, Inc., 846 F.2d 1079, 1090 (7th Cir.1988)(upholding injunction where actual confusion based primarily on one or two telephone calls a day over four-month period); World Carpets, Inc. v. Dick Littrell's New World Carpets, 438 F.2d 482, 489 (5th Cir.1971)(misdirected telephone calls from retailers probative of actual confusion); Horizon Fin., F.A. v. Ho-

rizon Bancorp, 2 U.S.P.Q.2d 1696, 1700 (E.D.Pa.1987) (granting preliminary injunction after finding confusion based primarily on approximately 25 teller reports of customer phone calls); OmniAmerica Group v. Street Gold Records, Ltd., 916 F.Supp. 672, 680 (N.D.Ohio 1996) (issuing preliminary injunction after finding confusion based on telephone calls from confused radio listeners). Defendants' argument goes to the weight of the evidence, for "evidence of misdirected letters is entitled to some weight as indicative of a likelihood of confusion." How much weight the evidence is entitled to is determined by the number of consumers misled and the form of the testimony. See J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, section 23.02[i] (3d ed.1995). Evidence that an appreciable number of consumers have been misled or confused as to the source of defendant's mark is often considered the most persuasive element of the test for likelihood of confusion in a trademark infringement lawsuit. Mary A. Donovan, Sorry, Wrong Number! Trademark Confusion from Misdirected Calls and Letters, 1 No. 11 Intell. Prop. Strategist 9 (Aug.1995). In contrast, evidence of relatively few misdirected phone calls may be dismissed as de minimus. Cinnabar Traders Ltd. v. Cinnabar Lane Ltd., 223 U.S.P.Q. 726, 1983 WL 687 (S.D.N.Y.1983)(such evidence is entitled to only slight evidentiary weight).

Many courts have grappled with the issue of how much weight should be given to evidence of actual confusion where the defendant is not afforded an opportunity to cross-examine the allegedly confused individuals. E.g., Rockland Mtg. Corp. v. Shareholders Funding, Inc., 835 F.Supp. 182 (D.Del.1993); Source Serv. Corp. v. Source Telecomputing Corp., 635 F.Supp. 600, 612 (N.D.Ill.1986). Some have concluded that such evidence is entitled to very little weight. See Vitek Sys. Inc., v. Abbott Labs., 675 F.2d 190 (8th Cir.1982)(testimony of Vitek's employees that customers had told them they were confused by defendant's mark was properly given little

---

**5.** Maria Blanco also testified that during her lunch break someone else would answer telephone calls and inform Maria, on her return from break, how many callers had asked for Banco Popular de Puerto Rico. The Court gives no consideration to this double hearsay testimony.

weight because the testimony was hearsay in nature); *Victory Pipe Craftsmen, Inc. v. Faberge, Inc.,* 582 F.Supp. 551 (N.D.Ill. 1984)(same). Other courts, although recognizing counsel's inability to conduct cross-examination, have given great weight to the testimony of plaintiff's employees concerning instances of actual confusion. *E.g., International Kennel Club of Chicago v. Mighty Star, Inc.,* 846 F.2d 1079, 1090 (7th Cir.1988).

 This Court finds that the testimony of plaintiff's employee as to instances of misdirected telephone calls should not be given the substantial weight accorded to in-court testimony by the allegedly confused consumers. The plaintiff has not submitted its evidence of actual confusion in the best, most complete manner. By making reasonable efforts, Popular Bank could have presented its evidence of actual confusion directly through the in-court testimony of at least several confused callers, thus allowing the defendants an opportunity to cross-examine them about the precise cause of their confusion. *See, e.g. Sorry, Wrong Number! Trademark Confusion from Misdirected Calls and Letters,* 1 No. 11 Intell. Prop. Strategist 9 (Aug.1995)(confusion may not be causally related to use of similar marks, but rather may be attributable to other factors such as directory assistance errors). Nonetheless, evaluating plaintiff's employee's testimony concerning actual confusion in light of the totality of the circumstances involved, the Court finds that it is entitled to some weight and is credible evidence of actual confusion.

**b. Misdirected correspondence.** At the evidentiary hearing on plaintiff's motion for preliminary injunction, Popular Bank presented nine pieces of misdirected correspondence—letters which were clearly intended for Banco Popular or Banco Popular de Puerto Rico. The correspondence includes a customer inquiry, inquiries relating to possible check-cashing fraud involving the "San Juan Branch," a follow-up letter from a third party sales person regarding a conversation with a Banco Popular executive, and five separately-dated "demand deposit statements" concerning financial transactions be-

tween Banco Popular and Corestates Bank International in New York. Misdirected letters are probative of customer confusion. *See Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 263 (5th Cir.1980)(misaddressed letter is evidence of actual confusion). Courts have found fewer than nine instances of actual confusion sufficient to support a finding that confusion is likely.[6] Furthermore, the Court finds that although the letters are hearsay, they are admissible under Fed.R.Evid. 803(3) because they reveal the "then existing state of mind of the writers." *See Freddie Fuddruckers, Inc. v. Ridgeline, Inc.,* 589 F.Supp. 72, 76 (N.D.Tex. 1984).

 7. Defendants' Intent. In assessing the likelihood of confusion, courts also examine the defendant's subjective intent. *John H. Harland Co.,* 711 F.2d at 977. A finding that the defendant has acted in bad faith is sufficient to justify an inference of confusing similarity. *Babbit Elec., Inc. v. Dynascan Corp.,* 38 F.3d 1161, 1179 (11th Cir.1994); *Playboy Enters., Inc. v. P.K. Sorren Export Co.,* 546 F.Supp. 987, 996 (S.D.Fla.1982); *see also Sun Banks,* 651 F.2d at 318–19 ("[t]hat a latecomer adopts another's name or mark, deliberately seeking to capitalize on the other's reputation and benefit from the confusion, is an important factor for any court"). To determine whether a defendant has acted in bad faith, a court must examine whether the defendant "adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Caruso & Co.,* 994 F.Supp. at 1462 (quoting *The Sports Authority, Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 964 (2d Cir.1996)).

Popular Bank contends that a close examination of the relationship between defendant Banco Popular de Puerto Rico and Popular Bancshares, Inc., the entity that sold the Popular Bank business to the plaintiff in 1982, shows that defendants have acted in bad faith by entering the South Florida mar-

---

**6.** *Cf., Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.,* 675 F.2d 1160, 1162 (11th Cir.1982) (two instances); *Roto–Rooter Corp. v. O'Neal,* 513 F.2d 44, 46 (5th Cir.1975);(four instances); *John*

*H. Harland,* 711 F.2d at 978 (two instances); *Jellibeans,* 716 F.2d at 843–44 (three instances); *AmBrit,* 812 F.2d at 1544 (four instances).

ket under the trademark Banco Popular. Plaintiff contends that Banco Popular de Puerto Rico directly controlled Popular Bancshares, Inc., and that when Popular Bancshares sold the Popular Bank business to the plaintiff, it sold the trademark and goodwill. Now defendants seek to reenter the South Florida market to compete with the plaintiff under the very mark that plaintiff's owners purchased in 1982 from an entity controlled by the defendants, effectively denying the plaintiff the benefit of the bargain. At this stage in the proceedings, however, the Court finds that the evidence as to intent does not point conclusively to a finding of either good or bad faith. *See Duluth News–Tribune,* 84 F.3d at 1097. It notes, however, that the presence or absence of intent is not critical to a finding of likelihood of confusion. *Chanel, Inc. v. Italian Activewear of Fla., Inc.,* 931 F.2d 1472, 1476 (11th Cir.1991).

To rebut plaintiff's likelihood of confusion evidence, the defendants presented expert witness Michael Rappeport who conducted a survey in a Miami mall interviewing 152 randomly-selected Spanish-speaking shoppers to determine whether consumers would likely be confused by defendants' use of the name Banco Popula. Mr. Rappeport concluded that they would not. Although the Court finds Rappeport's survey to be probative on the issue of likelihood of confusion, it discounts the survey's weight on a finding that the survey did not elicit a response to the real issue in the case, that is, whether the consumer would be confused by defendants' use of the name Banco Popular when a bank of the same name in English, Popular Bank, already exists in South Florida. In Rappeport's survey, each interviewee was asked a series of questions about the word "popular" and several other words which functioned as controls for the study. The questions were "Is this word (1) never used as part of a name of a bank (2) used as the part of the name of only one banking organization, or (3) used as part of the name of 2 or more banking organizations, or (4) don't you know?" The survey showed that 55 % of the respondents said that the name "popular" is used as part of the name of two or more banks while only 45 % said the name "popular" is used as part of the name of only one

banking institution. On these results, Rappeport drew a legal opinion on the ultimate issue in this case—that consumers would not be confused by defendants' use of the name Banco Popular in South Florida. The Court agrees with the plaintiff, however, that it is one thing to conclude that a number of people believe that more than one bank can use a particular word as part of its name. It is entirely another matter to then reach the conclusion that consumers will not be confused by two banks using essentially the same names. But even accepting defendants' argument that the survey measures the likelihood of confusion, the results could be used to substantiate plaintiff's position rather than the defendants' because according to the survey, 45 % of the respondents would be confused by the use of the name "popular" on more than one bank. It cannot be disputed that 45% is a substantial number of consumers.

Based on similarity of the mark, similarity of goods and services, similarity of retail outlets, and cautiously weighed evidence of actual confusion, the plaintiff has met its burden of showing that if the defendants used their mark in South Florida, there is a substantial likelihood that consumers will be confused about the source of services or the relationship between the plaintiff's and defendants' services.

### IRREPARABLE INJURY

■ The second factor for the Court to consider in determining whether to issue injunctive relief is whether Popular Bank will suffer irreparable harm if the injunction is not granted. For purposes of determining whether a preliminary injunction should be entered, if the plaintiff presents a sufficiently strong showing of likelihood of confusion, the Court may presume irreparable harm. *E. Remy Martin & Co.,* 756 F.2d at 1529. Plaintiff contends that if the injunction is not granted, the consumer confusion resulting from the Banco Popular television commercials will continue to cause members of the banking public to believe that Banco Popular's services are connected with or sponsored by Popular Bank. Ms. Blanco testified that many of the callers who telephoned Pop-

ular Bank in response to defendants' television commercial became upset or angry when told that Popular Bank did not offer the advertised services. Plaintiff argues that this type of confusion injures the long-established reputation and goodwill of Popular Bank and will cause Popular Bank to suffer irreparable harm. Because plaintiff has shown a likelihood of consumer confusion and that defendants' use of the mark Banco Popular would harm plaintiff's reputation, the Court finds that irreparable injury would occur in the absence of an injunction.

## HARM TO THE DEFENDANTS

The third factor to consider when assessing a motion for preliminary injunction is whether the threatened injury to the plaintiff outweighs any potential harm to the defendant. Plaintiff has asked the Court to enjoin the defendants from using the name Banco Popular or Popular Cash Express in South Florida and to prohibit them from broadcasting the Banco Popular commercials on "Sabado Gigante" in South Florida. A review of the evidence shows that at the present time, the defendants have a limited financial investment in South Florida. At the hearing, the evidence showed that Banco Popular had not established a commercial presence or reputation in South Florida prior to April 1997. Shortly after the commercials were first broadcast, Popular Bank contacted the defendants by letter and put them on notice of the trademark infringement claim. Subsequent to April 1997, Banco Popular's only significant commercial venture in South Florida was its purchase of an existing check cashing business. In light of these facts, the Court finds that a preliminary injunction prohibiting defendant from using the name Banco Popular in South Florida would cause defendant no significant harm.

## PUBLIC INTEREST

The final factor to consider when assessing the propriety of injunctive relief is the public interest. Popular Bank has shown that defendant's use of its mark in South Florida is likely to cause consumer confusion. Public policy concerns therefore weigh in favor of preliminary injunctive relief in order to minimize confusion in the marketplace. *Kason Indus., Inc. v. Component Hardware Group,*

*Inc.,* 120 F.3d 1199, 1207 (11th Cir.1997)(recognizing strong public interest in preventing the deception of consumers).

## III. CONCLUSION

For purposes of a preliminary injunction, the Court finds that the plaintiff has established the priority and validity of its mark and that defendants' use of the mark Banco Popular in South Florida is likely to cause consumer confusion. As such, plaintiff has shown a substantial likelihood of success on the merits. The Court further finds that in light of the likelihood of confusion, the plaintiff will suffer irreparable harm should the preliminary injunction not be issued and that the threat of injury to the plaintiff outweighs the minimal harm the injunction may cause the defendant. Finally, the Court finds that issuance of the preliminary injunction is in the public interest. Accordingly, it is ordered and adjudged that the defendants are enjoined from using the name Banco Popular in South Florida, namely Dade, Broward, Monroe, and Palm Beach counties. Defendants have ten days from receipt of this order to cease and desist broadcasting Banco Popular commercials on the television show "Sabado Gigante."

As for the name Popular Express, however, the Court finds that the plaintiff has not demonstrated a likelihood of success on the merits by showing that its rights to the mark are prior and superior to defendants' use of the mark and that the mark Popular Express is likely to cause consumer confusion. Review of the transcript of the preliminary injunction hearing shows that scant evidence was presented on the issue of confusion as it relates to the name "Popular Express." Testimony relating to the issue of consumer confusion was directed solely at the name Banco Popular. Although the words "banco" and "popular" are likely to cause consumer confusion when they are used together, no evidence was presented on the use of the word "popular" alone. Accordingly, the Court denies plaintiff's request to enjoin the use of the name "Popular Express" as within the scope of this preliminary injunction. Furthermore, the Court finds that the plaintiff's request for an injunction restraining the

use of "any other name or mark confusingly similar to" Popular Bank is overly broad. The preliminary injunction applies only to the name "Banco Popular."